Cornelia SMITH, Appellee,

v.

**SMITH'S TRANSFER CORPORATION, Appellant.**

Supreme Court of Tennessee, at Knoxville.

Aug. 3, 1987.

Phillip A. Fleissner, Fleissner, Cooper & Marcus, Chattanooga, for appellant.

Myron Bernard McClary, Maryville, for appellee.

## OPINION

FONES, Justice.

The employer appeals from the final decree of the trial court awarding forty-five percent permanent partial disability and other worker's compensation benefits. The three issues urged by the employer are: (1) the action is barred by the statute of limitations; (2) there was no injury by accident arising out of and in the course of employment; and (3) the medical proof did not establish a permanent impairment.

Plaintiff was employed as a typist by defendant on 17 March 1980. She had worked for several employers including the Atlanta Gas and Light Company, the Atlanta Police Department and the Internal Revenue Service for a total of twelve or thirteen years and insisted that she had never had any health problems until August 1980. At that time she began noticing a numbness in her hand, but it did not occur regularly and she did not do anything about it until about a year later. At that time she started dropping things and could not feel the difference between hot and cold water and went to the company doctor.

After referrals to two other doctors she was advised to see Dr. Joel Clements, a general and vascular surgeon. He saw her first in October 1981. She gave him a history of her hand tingling, burning and feeling dead and of pain in her left arm, particularly in the upper part, the symptoms having started approximately one year prior thereto and having become severe in the preceding three months. After tests and observation of plaintiff, Dr. Clements diagnosed her condition, in November 1981, as thoracic outlet syndrome and prescribed exercises and therapy designed to improve that condition.

Dr. Clements next saw her in March 1982. She had been seen by a hand specialist in the meantime who had recommended other studies to exclude other causes of hand discomfort. Plaintiff appeared to have benefitted from the therapy programs and Dr. Clements continued her on that regime. Plaintiff returned in September 1982, reported having difficulty, and Dr. Clements concluded that conservative care had been a failure and surgery was indicated. However, in October plaintiff was better and reported to Dr. Clements that she anticipated a job change. The operation was deferred as Dr. Clements thought such a change might help her problem.

Plaintiff's principal activity was typing bills of lading, each of which consisted of an original and nine copies. After typing she was required to remove the carbon which was done by gripping on the left side and pulling the carbons out with the right hand. She estimated that she prepared about one hundred and fifty bills of lading on an average shift. Also the keyboard she used required that her hands be above her waist when typing.

Plaintiff returned to Dr. Clements' office twice in May 1983 and in early June he had her admitted to the hospital for nerve block. Later, on 28 June she was again admitted to the hospital and he performed surgery "designed to relieve muscular and/or boney points of compression to the blood vessels and nerves involved."

Under date of 24 May 1983, Dr. Clements wrote the following letter to plaintiff's supervisor at Smith's Transfer:

I have been following Mrs. Smith since October, 1981, for a thoracic outlet syndrome. This is a musculoskeletal condition that is exacerbated by activity involving use of the hands above the waist level. At her request, I feel it would be in her best interest to avoid repetitive

activity with the arms above this level. If I need supply any further information, please let me know.

After the operation plaintiff had out-patient therapy. At the end of August, Dr. Clements told plaintiff she could return to light duty work in two weeks. Plaintiff testified that the surgery and therapy had given her relief from the pain. She returned to work 13 September 1983. She was not required to use the keyboard the first three weeks. In November she reported to Dr. Clements that she was having a lot of discomfort as her work activity increased and had been taking over-the-counter medication for pain. Plaintiff returned to Dr. Clements in December, and reported her condition by telephone on 10 December, 28 December, and 9 January 1984. She told Dr. Clements she was having muscle spasms, and he prescribed Valium for its muscle relaxant effect rather than as a sedative.

Plaintiff returned to Dr. Clements' office on 12 January 1984, and reported more pain in her left arm. Dr. Clements thought it time to discontinue the medication and do a work-tolerance evaluation. On 30 January plaintiff reported severe pain every time she operated the keyboard and Dr. Clements decided that she should discontinue all work that required significant use of her upper extremities. Following that visit, plaintiff quit her job with defendant and apparently had not resumed employment at the date of trial, 25 July 1985. Plaintiff took a real estate course in June of 1984 but was advised not to pursue it because of stress. In February 1985 she was having problems with high blood pressure and Dr. Clements referred her to her internist.

By stipulation the medical records of Dr. Thomas S. Templeton, an orthopedic surgeon, were admitted into evidence. Dr. Templeton first saw plaintiff on 4 September 1981. She gave a history of having had left arm pain for a year, "not really related to activity or rest." She also complained of pain of recent origin in the right shoulder which Dr. Templeton diagnosed as a bursitis type pain. The remainder of his examination found everything to be within normal limits and he reported, "no apparent evidence of thoracic outlet syndrome." She was seen by Dr. Templeton again on 25 September 1981 when she complained of pain in both arms. The E.M.G.'s on her left upper extremity revealed no evidence of nerve conduction deficits and Dr. Templeton noted, "from an orthopedic standpoint I am really at a loss to give an answer for her complaints."

On 16 July 1984, plaintiff returned to Dr. Templeton's office with complaints of trouble in her left arm. She reported that she had had surgery and that a nerve conduction study had been performed which was consistent with early left carpal tunnel. Dr. Templeton noted that he explained the symptoms of carpal tunnel and the benefits of surgery to plaintiff. On 15 August 1984, Dr. Templeton performed surgery described as "left carpal tunnel release."

Plaintiff was seen by Dr. Templeton on 27 August and 17 September 1984, at which time Dr. Templeton discharged her from his care with the notation, "do not feel there is any more to do regarding her hand." However, she returned on 26 November 1984. Plaintiff reported pain in her hand and swelling, that had bothered her for three and one-half weeks. Dr. Templeton's physical examination failed to find any swelling or any problems relating to the carpal tunnel syndrome. Plaintiff told him she was under the care of Dr. Henricksen, receiving physical therapy at Siskin's and seeing Dr. Williams, an internist. Dr. Templeton told her that "possibly the swelling and pain could be related to the heat being applied in physical therapy."

Three employees of defendant testified that plaintiff told them that she had had the same symptoms while working in Atlanta, but she did not have to do as much typing there. One of the employees testified that plaintiff told him she had had problems with her arm and shoulder most of her life. Plaintiff denied that she had made any of the statements attributed to her by those three employees.

On the statute of limitations issue, the trial judge found that:

as of November, 1981 the plaintiff was knowledgeable of her diagnosis and that she knew her condition was aggravated by her work, thus she could have made claim for medical benefits, but no lost time, as of the fall of 1981. ... She continued to work upon reasonable expectation that other work might be found which wouldn't aggravate her condition. Further, the court is of the opinion that she had no real knowledge that her condition was leading to a permanent, disabling condition. She continued working until May of 1983. ... While there are certainly some differences, the court believes that the law as interpreted by the Supreme Court in *Jones v. Home Indemnity Co.,* 679 S.W.2d 445 [Tenn. (1984)], dictates in this case that the statute did not commence to run until May 1983 when she left work.

Suit was filed on 2 May 1984, within one year of the time plaintiff left work.

Plaintiff's first notice to her employer that the condition Dr. Clements was treating her for was work related was given in May 1983, and shortly thereafter liability for worker's compensation benefits was denied. Defendant had a health care plan for employees which was ordered in the final decree to be reimbursed for medical expenses paid. No issue with regard to late notice was asserted by defendant.

· ██ The scope of review by this Court is governed by the material evidence rule, the claim having accrued prior to 1 July 1985. The trial judge found that the employee's disability did not manifest itself until May 1983. That finding is supported by material evidence. *See Jones,* 679 S.W.2d 445 (Tenn.1984) and *Hibner v. St. Paul Mercury Insurance Co.,* 619 S.W.2d 109 (Tenn. 1981).

We turn to the difficult issue of whether plaintiff sustained an injury by accident arising out of and in the course of employment. Irrespective of whether plaintiff had trouble with her arms and shoulder prior to August 1980 or its symptomology appeared for the first time in August 1980, there is no evidence whatever that it had its origin in any thing connected to plaintiff's work for defendant. Dr. Clements testified that thoracic outlet syndrome was primarily of congenital origin, such as a cervical rib or congenital variance of the musculature in front of and behind the blood vessels and nerves. Diseases such as polio can precipitate a thoracic outlet syndrome and the only other cause testified to by Dr. Clements was traumatic injury. Both plaintiff and Dr. Clements' testimony unequivocally negate the possibility that any traumatic injury on or off the job was a factor in the origin of plaintiff's thoracic outlet syndrome.

It is also undisputed that plaintiff suffered the same pain associated with thoracic outlet syndrome when engage in non-work related activities. There was no medical evidence that plaintiff's keyboard activity or bill of lading grasping produced any physical change or advanced the incidence of thoracic outlet syndrome other than increased pain. The medication, therapy, and surgery was for the purpose of alleviating pain. Dr. Clements' response to plaintiff's counsel's question "Does Mrs. Smith suffer any permanent physical impairment?", was as follows: "Based on the patient's pain I do feel that she has a degree of permanent impairment relative to the pain.". He stated the permanent impairment to be fifteen percent of the left arm.

The trial judge found that

From Dr. Clements' testimony it is possible that all of Miss Smith's problems were of a congenital origin or could have been precipitated by non-working activities. Dr. Clements—I won't say he vacillated, but your could read his testimony both ways, and at some point he said that he wasn't certain which of some conditions were more probable.

However, if you assume for the moment that the plaintiff's problem was mainly congenital, the court would tend to expect that its progress would be reasonably consistent; that is if her situation degraded through the years or deteriorated through the years, that the pattern would be reasonably consistent. And you wouldn't expect, at her age,

that all of a sudden for her condition to rapidly deteriorate.

In this case it appeared to the court that regardless of whether or not she had any prior problems, that the deterioration took place in such a manner as to suggest that there was a relationship between her work and her physical infirmities.

The court believes it is more likely that some factors at work hastened the problem that she suffered. Thus, the court thinks at the very least the work aggravated her condition, even if it might not have been solely caused by work.

Therefore, the court is of the opinion that the thoracic outlet syndrome did arise out of and within the course and scope of her employment.

The facts in this record do not support a finding that all of a sudden plaintiff's condition rapidly deteriorated. Accepting plaintiff's testimony, she first experienced pain in August 1980. It was October 1981 before the off and on pain resulted in her being referred to Dr. Clements. Under his care, with conservative treatment consisting of drugs for pain and therapy, she continued to work until May 1983. Still her only problem was pain, which Dr. Clements' letter of 24 May 1983 implicitly indicates would at least be alleviated if not resolved if her work activities did not involve, "use of the hands above the waist level."

The undisputed proof in this case renders it indistinguishable factually from *Boling v. Raytheon Co.*, 223 Tenn. 528, 448 S.W.2d 405 (1969). Mrs. Boling's activity as an employee was wiring and soldering small electrical instruments. The work required that she sit in a chair with her body in a fixed position with head down for about seven hours each day. It was her contention that maintaining that position each day for long periods of time produced repeated trauma to her neck and back resulting in repeated accidental injury. Her doctor testified that she had cervical neuritis secondary to degenerative arthritis which was aggravated by the posture required at her work place and was responsible for her

pain. The trial judge awarded Mrs. Boling worker's compensation benefits but this Court reversed, distinguishing *Boling* from *Brown Shoe Co. v. Reed*, 209 Tenn. 106, 350 S.W.2d 65 (1961).

In *Brown* the work required repeated movement of the employee's arm that caused the ulnar nerve to rub across one of the bones of the elbow which ultimately produced a disability. The Court in *Boling* pointed out that the material distinction on the issue of accidental injury was that the disabling condition of Mrs. Boling was degenerative arthritis, a condition not caused by employment, and that the only effect that the employee's work had on that condition was to increase the pain. The Court notes that: "It is true pain can be a disabling injury, but for such to be compensable it would have to be a work related injury." 223 Tenn. at 531, 448 S.W.2d at 407.

As in *Boling*, the only effect that plaintiff's work had upon her thoracic outlet syndrome was to increase her pain. Dr. Clements expressly testified that plaintiff did not sustain any damage to the nerves or blood vessels or otherwise as a result of her work for defendant. Her visits to Dr. Clements after surgery between June 1983 and the date of trial, and the surgery and after care by Dr. Templeton in 1984 reflect that she still had the same pain symptoms associated with thoracic outlet syndrome that she had when she worked for defendant. The ebb and flow of the pain from that condition was necessarily aggravated, during that period, from whatever non-work related activity she engaged in.

In *Boling*, the Court said:

In substance, what we have here is an employee with a disabling injury or disease not related to employment, but the employment does aggravate the disabling injury or disease by making the pain worse. This situation does not constitute an "accident" as this word is used in our workmen's compensation statutes.

223 Tenn. at 534, 448 S.W.2d at 408.

■ In the instant case, Mrs. Smith's work for defendant aggravated her pre-existing condition by making the pain worse but it did not otherwise injure or advance

the severity of her thoracic outlet syndrome or result in any other disabling condition.

Thus, we find plaintiff did not sustain an injury by accident within the meaning of the Worker's Compensation Act while employed by defendant.

The judgment of the trial court is reversed and plaintiff's suit is dismissed. Costs are adjudged against plaintiff.

HARBISON, C.J., and COOPER, BROCK, DROWOTA, JJ., concur.