**Barbara MATHENIA**

v.

**MILAN SEATING SYSTEMS.**

Supreme Court of Tennessee,
Special Workers' Compensation
Appeals Panel

Jan. 29, 2007 Session.

Oct. 17, 2007.

preme Court in accordance with Tennessee Code Annotated section 50–6–225(e)(3) (2005) for hearing and reporting to the Supreme Court of findings of facts and conclusions of law. The employer asserts that the trial court erred by finding that the employee had proven a compensable injury, determining that the date of injury was May 13, 2004, and awarding the employee a permanent partial disability of 50% to the right arm. Pursuant to our duty to review and weigh the evidence, we conclude that the evidence does not preponderate against the trial court's finding of a compensable injury. We disagree with the trial court's finding of the date of the injury and the trial court's award. Accordingly, we affirm the finding of a compensable injury and modify the date of injury and the amount of the award.

## ORDER

PER CURIAM.

It appears to the Court that the Judgment was filed in this matter on October 17, 2007, in which the Panel's findings of fact and conclusions of law were adopted and affirmed and the decision of the Panel made the judgment of the Court. The Court directs the publication of the opinion of the Special Workers' Compensation Appeals Panel at Jackson, January 29, 2007, Session.

P. Allen Phillips, Jackson, Tennessee, for the appellant, Milan Seating Systems.

Michael A. Carter, Milan, Tennessee, for the appellee, Barbara Mathenia.

## MEMORANDUM OPINION

JAMES F. BUTLER, SP.J., delivered the opinion of the court, in which JANICE M. HOLDER, J., and ROBERT E. CORLEW, Sp.J., joined.

This workers' compensation appeal has been referred to the Special Workers' Compensation Appeals Panel of the Su-

## FACTS

Plaintiff, Barbara Mathenia, initiated this action to recover workers' compensation benefits for an alleged work related right thumb injury. The employer, Milan Seating Systems, denied liability. In the alternative, the employer challenged the date of injury claimed by Plaintiff.[1]

1. The date of injury is significant because of Tennessee Code Annotated section 50–6–241

(2005). If the date of injury to a scheduled member is set prior to July 1, 2004, it is not

At the time of trial in this workers' compensation case, Plaintiff was fifty years of age. She had completed high school but had no additional formal education or training. Plaintiff had been employed with Defendant for seventeen years prior to being terminated by Defendant's successor, on or about October 25, 2005, because of an inability to accommodate work restrictions. Plaintiff was previously employed in a sewing factory for approximately five years prior to working for Defendant.

Plaintiff testified that she first noticed pain and swelling in her right thumb while performing her regular job duties in May 2004. Plaintiff denied any prior problems with her right thumb or arm. She completed an accident report on May 13, 2004, and also spoke to her supervisor at that time. She did not request medical attention. Plaintiff continued to work at her regular job. She completed another accident report on November 19, 2004, because the problem with her thumb was "a lot worse" and she felt she needed to see a doctor. Plaintiff requested medical attention and was given a panel of doctors. She initially saw Dr. Twilla, who referred her to Dr. Claiborne Christian, an orthopaedic surgeon, who first saw her on January 5, 2005. Plaintiff told Dr. Christian that she had not had an "exact injury," but she did relate her injury to her job, which she described as "a lot of repetitious type work." Dr. Christian initially diagnosed Plaintiff as having tendinitis and overuse syndrome and placed her on light duty. He continued to treat Plaintiff conservatively and by February 2, 2005, he reported that Plaintiff was "better, but not normal." Dr. Christian's x-rays showed some "early mild degenerative changes, but nothing that would require surgery." He advised Plaintiff to do her regular job and placed no restrictions on her activity due to her thumb problem or the carpal tunnel problem for which he also treated her.[2]

Dr. Christian continued to see Plaintiff for both her left carpal tunnel and right thumb through June 15, 2005. At that point, he told Plaintiff that she could "possibly try her regular job." His final diagnosis was tendinitis and early degenerative joint disease of the thumb and CMC joint. Dr. Christian described Plaintiff's condition as osteoarthritis, which is "wear and tear arthritis," but he was unsure what caused it. Dr. Christian testified as follows:

Well, my feeling on that is that without a definite injury, while her work and activities might have caused her an increase in her discomfort, I'm unaware of any specific anatomic change that would have either caused or aggravated that condition. Her work could certainly aggravate the pain associated with it, but I don't think it aggravated the condition, at least I have no evidence that suggests that.

Dr. Christian testified that activities outside the workplace would have the same effect that activities in the workplace have, i.e., that such activities are "going to aggravate that condition to some degree, at least the pain associated with it, [and] may cause her to have some swelling and that sort of thing." Dr. Christian testified that it was difficult to say whether any definite anatomic change came from Plaintiff's

subject to the "caps" on awards of permanent partial disability. This issue is discussed in detail below.

2. Plaintiff also had a carpal tunnel injury at the same employer, which was the subject of a separate workers' compensation settlement, which was not at issue at trial. The parties had resolved the carpal tunnel injury to Plaintiff's left arm to their mutual satisfaction and it had been approved by the trial court.

work at Milan Seating Company, as opposed to a normal aging process, or to other activities. He assessed no permanent impairment.

Plaintiff saw Dr. Harold Antwine, also an orthopaedic surgeon, on September 21, 2005. Plaintiff gave him a history of having problems in May 2004 while sewing at work. On physical examination, Dr. Antwine found pain at the metacarpal phalangeal (MP) joint, which is at the base of the thumb. He also found swelling, discomfort, and limited motion due to the pain. He found a palpable difference between the right and the left as to the swelling. Dr. Antwine diagnosed Plaintiff with inflammation and arthritis of the right thumb joint. The arthritis was described by Dr. Antwine as osteoarthritis, which is not caused by trauma. Dr. Antwine placed Plaintiff in a short arm cast to immobilize the joint, followed by anti-inflammatory medications and a steroid pack. He also took her off work at this time. She was taken out of the cast in October 2005 with the same diagnosis. Dr. Antwine discharged Plaintiff to return to work with permanent restrictions to avoid repetitive heavy gripping. He did not assess a specific impairment rating pursuant to the AMA Guidelines, but he opined that Plaintiff did have some degree of impairment from the arthritic changes seen on her x-rays. Dr. Antwine could not specifically state when those came about but did testify that continued use of her hand and heavy gripping could potentially aggravate the condition.

Plaintiff saw Dr. Joseph Boals, III, an orthopaedic surgeon, for an independent medical evaluation on November 9, 2005. Dr. Boals performed a physical examination and found that the x-rays of Plaintiff's right arm indicated severe arthritis of the MP joint with subluxation of the phalanx. Dr. Boals was unsure how long the arthritis in her joint had been present, but stated that it predated the year 2004. Regarding causation, Dr. Boals stated the following:

Well, it's pretty obvious that Ms. Mathenia most likely had degenerative arthritis in her thumb joint before she actually reported any symptoms in 2004. Now, it still could be that this would meet the definition of aggravation if she had no serious level of symptoms before the work she did at Milan caused it to hurt, and she'll have to make a good case of that. That would be important, that she can accurately associate increased symptoms which made her go see the doctor about the thumb with her job. On that basis it would be job related.

Dr. Boals also stated the following concerning causation:

So to get—we are used to talking about, all of us, how to prove there has been aggravation by work. Well, the real way to prove it is if the symptom level is dramatically increased by the work incident, whatever it is. So if you see where this woman has been getting treatment for this thumb all along and there was no real need for a doctor to do anything more than observe it, then your premise that maybe this was just something that was going on is true; but if we've got a real incident, something that then flares that thumb into a fulminating painful situation, then it's work related and it's an aggravated injury.

Dr. Boals further testified, using inductive reasoning, that there was some anatomic change because there was an acute onset of pain with no previous symptoms, and Plaintiff associated the incident with her work.

Dr. Boals assigned a 3% permanent impairment to the arm based on the AMA Guides, 5th Edition, due to loss of range of motion. He testified that, while the actual

symptomatic area does not extend into Plaintiff's arm, "the effect of the function of the upper extremity is definitely there." He explained that the tendon which passes down across the top of the thumb originates in the forearm and therefore the grip function in the hand was affected.

Following Plaintiff's initial visit to Dr. Christian, she had returned to work on light duty for a time, then returned to regular duty until she saw Dr. Antwine. Dr. Antwine took her off work while he treated her with the cast. Thereafter, he placed permanent restrictions upon her activities. When she attempted to return to work, she was terminated by Kongsberg Automotive because of its inability to accommodate those restrictions.[3] Karen Smith, an employee of Defendant and later an employee of Kongsberg Automotive, confirmed that the plant had no job that would allow Plaintiff to continue working within the permanent restrictions placed on her by Dr. Antwine.

At the conclusion of the proof, the court found that the date of injury was May 13, 2004, and that Plaintiff had sustained a 50% permanent partial impairment to her right upper extremity.[4]

## STANDARD OF REVIEW

Our review is de novo upon the record of the trial court, accompanied by a presumption of correctness of the findings of fact, unless the preponderance of the evidence is otherwise. Tenn.Code Ann. § 50–6–225(e)(2) (2005). Conclusions of law established by the trial court come to us without any presumption of correctness. *Watt v. Lumbermens Mut. Cas. Ins. Co.,*

62 S.W.3d 123, 127 (Tenn.2001). We have recognized that the causal relationship between the employee's employment and the injury must be established by the preponderance of the expert opinions supplemented by the lay evidence. *Fritts v. Safety Nat'l Cas. Corp.,* 163 S.W.3d 673, 678 (Tenn.2005). The proof of the causal connection may not be speculative, conjectural, or uncertain. *Clark v. Nashville Mach. Elevator Co.,* 129 S.W.3d 42, 47 (Tenn. 2004); *Simpson v. H.D. Lee Co.,* 793 S.W.2d 929, 931 (Tenn.1990); *Tindall v. Waring Park Ass'n,* 725 S.W.2d 935, 937 (Tenn.1987). Absolute certainty with respect to causation is not required, however, and the Court must recognize that, in many cases, expert opinions in this area contain an element of uncertainty and speculation. *Fritts,* 163 S.W.3d at 678. When all of the medical proof is presented by deposition, we must determine the weight to be given to the expert testimony and draw our own conclusions with regard to the issues of credibility. *Bohanan v. City of Knoxville,* 136 S.W.3d 621, 624 (Tenn.2004); *Krick v. City of Lawrenceburg,* 945 S.W.2d 709, 712 (Tenn.1997). The extent of an injured worker's vocational disability is a question of fact. *Seals v. England/Corsair Upholstery Mfg. Co.,* 984 S.W.2d 912, 915 (Tenn.1999).

## INJURY ARISING OUT OF AND WITHIN THE SCOPE OF EMPLOYMENT

Plaintiff contends, and the trial court found, that she suffered a compensable injury as a result of an aggravation of her pre-existing arthritis, caused by her work activities. Defendant contends that

---

3. Kongsberg Automotive purchased Milan Seating Systems after Plaintiff was injured and was a successor employer of Plaintiff.

4. The right upper extremity is not a scheduled member under the Tennessee Workers' Compensation statute. Tenn.Code Ann. § 50–6–207(3)(A)(ii) (2005). For purposes of this appeal, this Court will assume the award was to the right arm, which is a scheduled member. *Id.* § 50–6–207(3)(A)(ii)(m).

Plaintiff's work activities did not accelerate her underlying condition nor cause any anatomical change in the affected area of the body and that she therefore did not sustain a compensable injury. The Court recently noted:

> Under Tennessee law, when a plaintiff suffers from a pre-existing condition, a claim is not compensable when the employment does not cause an actual progression or aggravation of the underlying injury. *See Cunningham v. Goodyear Tire & Rubber Co.*, 811 S.W.2d 888, 890 (Tenn.1991). If the employment causes an increase in pain with no corresponding permanent anatomical change, then there is no new compensable injury. *Id.; Talley v. Virginia Ins. Reciprocal*, 775 S.W.2d 587, 591 (Tenn.1989).

*Barnett v. Milan Seating Sys.*, 215 S.W.3d 828, 835 (Tenn.2007).

We review the record to determine if the evidence preponderates against the trial court's finding that Plaintiff's work activities worsened her pre-existing condition in a manner sufficient to constitute a compensable injury under this standard.

Plaintiff first noticed problems with her right thumb in May 2004 while sewing head rests and "having to turn them." This was her normal activity at work. She performed this task daily.

Both Drs. Christian and Antwine, who treated Plaintiff for her thumb condition, diagnosed Plaintiff as having osteoarthritis. Dr. Christian characterized this type of arthritis as "wear and tear arthritis." Dr. Antwine described it as "arthritis not caused by some trauma, or rheumatoid arthritis."

Dr. Christian testified that Plaintiff said she had not had an "exact injury" but did relate her thumb condition to her job at Milan Seating Company. Dr. Christian was unsure of the cause of Plaintiff's condition. Dr. Christian felt that certainly Plaintiff's work aggravated her pain and discomfort but could not say whether or not any specific change in the anatomy of the MP joint of her thumb was caused by her work.

Dr. Antwine stated as follows:

> Well, if she was not having any symptoms prior to her injury at work, and ... was completely pain free, and after that injury began having problems after a period of time, then I would suspect that the injury at work may have caused her problem ... it could have initially caused some damage to the joint that over time, symptoms started occurring and with an arthritic joint, usually repetitive activity or stress through that area, will cause discomfort and pain.

Dr. Boals agreed that Plaintiff most likely had degenerative arthritis in her thumb joint before she actually reported her symptoms, but stated that, if she had no serious level of symptoms before, her work at Milan Seating aggravated the underlying condition by causing it to hurt. Dr. Boals stated:

> There is no way to know [whether or not her work caused anatomical change] except that we know that to have increased pain, something has to change anatomically to cause that pain if we have got a stable person who is not faking, and so on that basis, a good argument could be made by inductive reasoning that there has been some change.

We have independently reviewed the medical testimony and the other proof and we are persuaded that the evidence does not preponderate against the finding of the trial court that Plaintiff had suffered a compensable injury to her arm.

## DATE OF INJURY

■ Having concluded that Plaintiff did indeed suffer a compensable injury to her arm, we now turn to the date of injury.

Plaintiff first reported symptoms with her thumb on May 13, 2004. She filled out an accident report and reported same to her supervisor, but sought no medical treatment. She did not miss any work. On November 19, 2004, she again reported symptoms to her supervisor and filled out an accident report. At this time, and for the first time, Plaintiff sought medical care. She was placed on light duty by Dr. Christian in January 2005 but continued to work. She was taken off work by Dr. Antwine in September 2005. When she attempted to return to work in October 2005, her permanent restrictions could not be accommodated, and she was terminated.

Plaintiff takes the position that the date of injury was May 2004 and that there was an identifiable injury at that time. Defendant urges that Plaintiff's injury is a gradually occurring injury, which has been described as a "new injury each day at work." *Lawson v. Lear Seating Corp.*, 944 S.W.2d 340, 341 (Tenn.1997).

While Plaintiff urges on appeal that she suffered a specific incident on May 13, 2004, her testimony more accurately describes the ordinary and usual strain and duties of her job. There is no other proof in the record of any accident or incident that may have injured Plaintiff's thumb. We are therefore persuaded that the injury suffered by Plaintiff was a gradual injury and that the development of her symptoms resulted from the culmination of ongoing injuries. Plaintiff continued working for several months beyond May 2004, and each additional day she worked constituted a successive injury.

■ It has long been held that the date of injury in a gradually occurring context is when Plaintiff is no longer able to work. *Barker v. Home–Crest Corp.*, 805 S.W.2d 373, 373–74 (Tenn.1991). This is the so-called last day worked rule. The last day worked is determined by reference to the date on which the employee could no longer perform his or her work. *Lawson*, 944 S.W.2d at 341. The Supreme Court has recently re-emphasized the application of this rule. *See Bldg. Materials Corp. v. Britt*, 211 S.W.3d 706, 713 (Tenn. 2007).[5] Plaintiff testified that Dr. Antwine took her off work on September 21, 2005, when he put her arm in a cast. Plaintiff never returned to work after that date. We therefore conclude that September 21, 2005, is the correct date of injury in this case.

■ Tennessee Code Annotated section 50–6–241(d)(1) applies to injuries which occur on or after July 1, 2004. This statute applies to injuries to the body as a whole and to scheduled members with a value of 200 weeks of benefits or more. It provides that if the employee was not returned to employment at a wage equal to or greater than the wage the employee was receiving at the time of the injury, the maximum permanent partial disability benefits that

---

5. In *Britt*, we overruled our prior decision in *Bone v. Saturn Corp.*, 148 S.W.3d 69 (Tenn. 2004), to the extent that it held that the last day worked rule was inapplicable in cases where the employee provided the employer with actual notice of a gradually occurring injury. 211 S.W.3d at 713. Because this case was tried after our ruling in *Bone* but before our ruling in *Britt*, the issue of whether the *Bone* rule applies depends on whether *Britt* applies retroactively. Generally, judicial decisions overruling previous decisions are given retroactive effect. *Hill v. City of Germantown*, 31 S.W.3d 234, 239 (Tenn.2000). Because *Britt* overruled a previous decision, we determine that it does apply retroactively and that the rule announced in *Bone* is inapplicable.

the employee may receive for whole body injuries or specified scheduled member injuries may not exceed six times the medical impairment rating determined. Tenn. Code Ann. § 50–6–241(d)(2)(A) (2005). Further, "[i]f the court awards a permanent partial disability percentage that equals or exceeds five (5) times the medical impairment rating, the court shall include specific findings of fact in the order that detail the reasons for awarding the maximum permanent partial disability." *Id.* § 50–6–241(d)(2)(B).

We have found that the date of injury is September 21, 2005. It is undisputed that the employer did not return Plaintiff to her employment at a wage equal to, or greater, than the wage she was receiving at the time of the injury. Therefore, the maximum permanent partial disability award that Plaintiff may receive for her scheduled member injury may not exceed six times the medical impairment rating.

Plaintiff was fifty years of age and had completed high school, but had no additional formal educational training. Dr. Antwine placed restrictions on Plaintiff that resulted in her termination from her employment. Plaintiff had been involved in repetitive work for approximately twenty-three years. Dr. Christian opined that activities involving the use of her thumb would aggravate her osteoarthritis and cause pain and possibly swelling. Dr. Antwine permanently restricted Plaintiff from work involving repetitive heavy gripping. He further felt that continued use of her hand and heavy gripping, or activity utilizing the injured hand could potentially aggravate her osteoarthritis. Dr. Boals concurred in these assessments. We find that there is sufficient reason for Plaintiff to be awarded the maximum benefit available to her, to wit, six times her anatomical impairment rating of 3% to the arm, or 18%

permanent partial disability to the right arm.

## CONCLUSION

We, therefore, hold that the evidence preponderates against the finding of the trial court as to the date of injury and as to the extent of vocational disability, that Plaintiff's date of injury is September 21, 2005, and that her vocational disability is capped at six times the anatomical medical impairment rating given to her by Dr. Boals. The judgment is accordingly modified and Plaintiff is awarded benefits for an 18% permanent partial disability to her right arm. Costs are assessed to the appellee, Barbara Mathenia.