IN THE SUPREME COURT OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 11, 2008

# CLARENCE TROSPER v. ARMSTRONG WOOD PRODUCTS, INC.

**Appeal by Permission from the
Supreme Court Special Workers' Compensation Appeals Panel
Chancery Court for Scott County
No. 9446     Billy Joe White,  Chancellor**

---

**No. E2007-00816-SC-WCM-WC - Filed December 30, 2008**

---

Following surgeries on both of his hands, the employee filed suit seeking workers' compensation benefits on the theory that the repetitive nature of his work in the employer's flooring business exacerbated a pre-existing, but dormant, arthritic condition.  The trial court found that the employee's work duties had worsened his osteoarthritis and awarded 40% permanent partial disability to each hand.  The trial court also awarded temporary total disability benefits for the time during which the employee was recuperating from the surgeries and unable to work.  The Special Workers' Compensation Appeals Panel reversed the trial court, holding that the employee's condition was neither caused nor aggravated by the work he performed for the employer.  Because the evidence does not preponderate against the trial court's finding of causation and the award of benefits, we reverse the decision of the Appeals Panel and affirm the judgment of the trial court.

**Tenn. Code Ann. § 50-6-225(e)(5)(B); Judgment of the Special Workers' Compensation Appeals Panel Reversed**

GARY R. WADE, J., delivered the opinion of the court, in which JANICE M. HOLDER, C.J., CORNELIA A. CLARK, J., and FRANK F. DROWOTA, III, Sp.J., joined. WILLIAM C. KOCH, JR., J., dissenting.

Linda J. Hamilton Mowles, Knoxville, Tennessee, for the appellee, Armstrong Wood Products.

C. Patrick Sexton, Oneida, Tennessee, for the appellant, Clarence Trosper.

**OPINION**

**Facts and Procedural History**

Clarence Trosper ("Employee"), age sixty-four at the time of trial, holds a Graduate Equivalence Diploma and earned a welding certificate from a trade school.  His work history includes three years of military service, nine years employment as a press operator making springs for mattresses, and twenty years as a welder for a coal mining business.

In 1993, the Employee accepted employment with Armstrong Wood Products ("Employer"), a manufacturer of flooring products. For the first four years of his tenure there, the Employee operated sanding and sawing equipment inside the plant. In 1997, he was assigned to work outdoors, removing heavy boards by hand rapidly and continuously from a conveyor, sorting them, and then stacking them by grade. The boards ranged in size from sixteen to twenty feet in length and six to fourteen inches wide. In his new assignment, the Employee, who had never before experienced any problems with either hand, developed intense pain in both of his hands, particularly at the base of his thumbs near his wrist. He reported the occurrence to his supervisor and received medical treatment for the pain, including an injection near the base of one of his thumbs. The symptoms worsened after the injection.

When the Employee asked to return to a position inside the plant which involved less stress on his hands, the Employer agreed, transferring him to a job which entailed moving and stacking veneer. The Employee performed his new assignments capably and did not experience any further difficulty until 2000 or 2001, when he was transferred to a position which required him to lift forty-five to seventy pound buckets to shoulder level and then pour the chemical contents into a hopper. As he used his thumbs to grasp the wire handles on the buckets, he experienced a "real sharp pain" during each lift. His new responsibilities also required filling approximately 100 empty tubes an hour with wood filler and then labeling and packaging the tubes.

In 2004, after returning to work from a knee operation unrelated to this claim, the Employee again experienced pain in his hands from lifting the buckets of chemicals. He reported this problem to his supervisor and asked if the buckets could be made lighter. The weight of the buckets was not reduced, and the Employer instructed the Employee to consult with Dr. Cletus McMahon, the physician who had performed the knee surgery. Dr. McMahon diagnosed the Employee with bilateral carpometacarpal osteoarthritis, a joint disease characterized by the degeneration of cartilage in the joints of the hands, specifically at the base of the thumb near the wrist.[1] Dr. McMahon performed a surgical fusion of the joint at the base of the Employee's thumb in his right hand on October 29, 2004. When the Employee returned to the same position, however, he experienced pain in his left hand, necessitating a surgical fusion of the affected joint in June of 2005. Afterward, the Employee retired, having completed twelve years of service to the Employer.

At trial, the Employee testified that he could no longer fully extend his thumbs, had trouble making a pinching motion, had diminished grip strength, and had continuous pain in his hands. He also stated that his condition required that he forego some of his hobbies, such as hunting, fishing, and gardening. He could not use a weed eater or a chain saw as he had done in the past.

After the Employee's second surgery, Dr. William Kennedy, an orthopedic surgeon, performed an independent medical evaluation on the Employee. The Employee informed Dr. Kennedy that he began to experience pain, numbness, and tingling in both of his hands for the first

---

[1] Osteoarthritis, a fairly common type of arthritis, "is accompanied by pain and stiffness" in the affected joint, "particularly after prolonged activity." Dorland's Illustrated Medical Dictionary 1197 (27th ed. 1988).

time in 1997 and 1998 while sorting and stacking lumber for the Employer.  He reported that since his 2004 and 2005 surgeries, he has continued to have pain in both thumbs and complained that he had not regained normal strength or range of motion in either hand.  Furthermore, the Employee experienced difficulty gripping and maneuvering small objects while doing ordinary tasks, such as brushing his teeth, combing his hair, bathing, or preparing food.

Based upon the examination, which included a review of x-rays taken before and after the surgeries, Dr. Kennedy concluded in his deposition that the Employee had severe osteoarthritis in both of his thumbs.  According to Dr. Kennedy, the Employee's arthritic condition "more likely than not . . . existed as a disease process" prior to his 1997 work stacking lumber, although the condition was "dormant" until he undertook those job responsibilities.  While conceding that repetitive activity is not a cause of osteoarthritis itself, it was his opinion that the "cumulative trauma" of the Employee's work duties aroused the condition "from dormancy into a regularly painful reality."  Dr. Kennedy further opined that the nature of the Employee's job "permanently aggravated and advanced [the] pre-existing, underlying carpometacarpal osteoarthritis in both of his thumbs and caused the painful instability of those joints which ultimately necessitated" the surgeries in 2004 and 2005.  It was also his opinion that the "cumulative trauma" of the Employee's work made the surgeries necessary and the osteoarthritis "would not have been advanced or aggravated to the extent that it was" but for his work activities.  When asked what he meant by "aggravated," Dr. Kennedy responded that the Employee's duties "caused a . . . change in the biomechanics of the thumb by gradually stretching and loosening the ligaments that hold the base of the thumb in proper position, and by gradually and increasingly damaging, disrupting, and thinning" the cartilage between the bones.

Dr. Kennedy, whose testimony was extensive relative to the other doctors who testified, specifically attributed the Employee's diminished ability to spread his thumbs apart from his hands "to the injuries that he had suffered to the bases of both of his thumbs."  It was his assessment that the stacking of lumber had "continued to aggravate and advance the subluxation or partial dislocation and osteoarthritis of both of his thumbs."  When asked to state the effect of repetitively lifting the buckets of chemicals during the last several years of his employment, Dr. Kennedy responded that such activity "would have increased the forces conducted through the bases of his thumbs and would reasonably have been expected to aggravate and advance the osteoarthritis."  Dr. Kennedy also believed that the surgical fusion of the joints in the Employee's thumbs "increased the normal biomechanical forces" in his thumbs, making him more vulnerable to injury.  Finally, Dr. Kennedy assigned anatomical impairments of 8% to each hand, and recommended that the Employee permanently avoid "vigorous pushing or pulling, or rapid, repeated motions with either of his hands."  It was his opinion that the Employee could not "carry out maximum gripping or pinching with either hand," or, with the use of two hands, lift or carry twenty pounds occasionally or ten pounds frequently, or lift or carry five pounds with one hand.

Dr. Brantley Burns, also an orthopedic surgeon, likewise conducted an independent medical examination of the Employee.  He concurred in the diagnosis of osteoarthritis, and testified by deposition that causation was "probably a combination of things. [While i]t certainly has a large

3

genetic component to it . . . any activity that you do can . . . worsen [the] problem to the point of needing some treatment." He explained that "all and any" activity, including work, would cause the condition to worsen.

Dr. Ronald Fadel, an orthopedic physician who no longer performs surgery, reviewed the Employee's medical records on behalf of the Employer. Unlike the other two physicians, Dr. Fadel did not actually examine the Employee. He testified by deposition that the cause of osteoarthritis, which he described as common for those in "the sixth and seventh decades of life, regardless of work activity," is unknown. It was his opinion that there was "no known relationship" between repetitive use of the hands and the development of the disease. Dr. Fadel testified that "activities of daily living [are] as likely to produce this disease in one person as it is in another." In this regard, he disagreed with Dr. Kennedy's conclusion that the Employee's work aggravated his pre-existing arthritic condition. Dr. Fadel conceded, however, that had he actually treated the Employee, he "would understand more of his disease and what's going on in the process."

Dr. Norman Hankins, a vocational evaluator, testified that the Employee's IQ was in the "low/average range," and that he could read at a fifth grade level. According to Dr. Hankins, the Employee possessed math skills at the seventh grade level. Dr. Hankins assessed a vocational disability of 82% to the hands.

The trial accredited the testimony of the Employee, finding that his underlying osteoarthritis was worsened and advanced by his work activities, necessitating the fusion surgeries on the base of his thumbs. The trial court awarded 40% permanent partial disability to each hand, plus temporary total disability benefits for the periods of time that the Employee was off work recuperating from the surgeries on his hands.[2] By awarding benefits, the trial court gave greater credence to the deposition testimony of Dr. Kennedy, observing that "Dr. Kennedy says that there is causation," and "the other [D]octor [Fadel] says there is not." The Employer appealed, first contending that the trial court erred by finding that the Employee had suffered a compensable aggravation of his pre-existing osteoarthritis; and second, challenging the award of temporary total disability benefits. Finally, the Employer maintained that the award of 40% to each hand was excessive.

The Special Workers' Compensation Appeals Panel concluded that the osteoarthritis in the Employee's hands was not caused or aggravated by the work he performed for the Employer and, therefore, that the trial court had erred by awarding any benefits. In reaching this conclusion, the Panel observed that all of the physicians agreed that the underlying condition itself was not caused by the employment, and that the disease, by its nature, is progressive. The Panel specifically relied on the opinion of Dr. Fadel that there was no relationship between work activities and the development or advancement of osteoarthritis. We granted the Employee's request for full Court review in order to address these important issues.

---

[2] The employee was absent from work due to the first hand surgery from November 6, 2004, to February 11, 2005. He missed work from June 24, 2005, to October 30, 2005, for the second hand surgery.

4

**Standard of Review**

We review the judgment of the trial court in workers' compensation cases "de novo upon the record . . . accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. Code Ann. § 50-6-225(e)(2) (2008). In such cases, the reviewing court must conduct an in-depth examination of the trial court's factual findings and conclusions. Wilhelm v. Krogers, 235 S.W.3d 122, 126 (Tenn. 2007). When the trial court has seen and heard the witnesses, considerable deference must be afforded any factual determinations. Tryon v. Saturn Corp., 254 S.W.3d 321, 327 (Tenn. 2008). The same deference need not be afforded findings based upon documentary evidence, such as depositions. Glisson v. Mohon Int'l, Inc./Campbell Ray, 185 S.W.3d 348, 353 (Tenn. 2006). Indeed, where medical testimony is presented by deposition, this Court may independently assess the medical proof to determine where the preponderance of the evidence lies. Crew v. First Source Furniture Group, 259 S.W.3d 656, 665 (Tenn. 2008). Reviewing courts afford no presumption of correctness to any conclusions of law. Perrin v. Gaylord Entm't Co., 120 S.W.3d 823, 826 (Tenn. 2003). Nevertheless, the testimony of expert witnesses must be considered in conjunction with the testimony of an employee as a lay witness. Thomas v. Aetna Life & Cas. Co., 812 S.W.2d 278, 283 (Tenn. 1991).

**Applicable Law**

Any employee seeking to recover workers' compensation benefits must prove that the injury both arose out of and occurred in the course of the employment. See Tenn. Code Ann. § 50-6-102(12) (2008). "The phrase 'arising out of' refers to the cause or origin of the injury and the phrase 'in the course of' refers to the time, place, and circumstances of the injury." Crew, 259 S.W.3d at 664. An injury arises out of employment when there is a causal connection between the conditions under which the work is required to be performed and the resulting injury. Fritts v. Safety Nat'l Cas. Corp., 163 S.W.3d 673, 678 (Tenn. 2005). Except in the most obvious cases, causation must be established by expert medical evidence. Glisson, 185 S.W.3d at 354. Although evidence of causation may not be speculative or conjectural, "absolute medical certainty is not required, and reasonable doubt must be resolved in favor of the employee." Id. Accordingly, "benefits may be properly awarded to an employee who presents medical evidence showing that the employment could or might have been the cause of his or her injury when lay testimony reasonably suggests causation." Id.; see also Fitzgerald v. BTR Sealing Sys. N. Am. – Tenn. Operations, 205 S.W.3d 400, 404 (Tenn. 2006).

Equally well-settled is the principle that an employer takes an employee "as is" and assumes the responsibility of having a pre-existing condition aggravated by a work-related injury which might not affect an otherwise healthy person. Hill v. Eagle Bend Mfg. Inc., 942 S.W.2d 483, 488 (Tenn. 1997). Thus, an employer is "liable for disability resulting from injuries sustained by an employee arising out of and in the course of his employment even though it aggravates a previous condition with resulting disability far greater than otherwise would have been the case." Baxter v. Smith, 364 S.W.2d 936, 942-43 (Tenn. 1961). Tennessee law likewise recognizes that a worker may sustain a compensable gradual injury as the result of continual exposure to the conditions of employment. See Cent. Motor Express, Inc. v. Burney, 377 S.W.2d 947, 948-50 (Tenn. 1964). In other words, unlike in some other jurisdictions, there is no requirement that the injury be traceable to a definite moment

5

in time or triggering event in order to be compensable.

However firmly implanted the principle may be that an employer must bear the risk of aggravation of an employee's pre-existing condition, the precise contours of the rule have not always been articulated in a consistent manner. We recently stated in Barnett v. Milan Seating Systems:

> Under Tennessee law, when a plaintiff suffers from a pre-existing condition, a claim is not compensable when the employment does not cause an actual progression or aggravation of the underlying injury. If the employment causes an increase in pain with no corresponding permanent anatomical change, then there is no new compensable injury.

215 S.W.3d 828, 835 (Tenn. 2007) (citations omitted). This description of the law finds its origin in cases that denied compensation because the work injury only made the pain of the pre-existing condition worse, but did not otherwise advance or progress the condition or result in any other disabling condition. See, e.g., Townsend v. State, 826 S.W.2d 434, 436 (Tenn. 1992); Smith v. Smith's Transfer Corp., 735 S.W.2d 221, 225-26 (Tenn. 1987). It is notable that none of these cases used the "anatomical change" terminology, although numerous subsequent opinions of the Workers' Compensation Appeals Panel have done so.

There is also a long history of cases in Tennessee establishing that there is "no doubt that pain is considered a disabling injury, compensable when occurring as the result of a work-related injury." Talley v. Va. Ins. Reciprocal, 775 S.W.2d 587, 592 (Tenn. 1989) (citing Boling v. Raytheon Co., 448 S.W.2d 405, 407 (Tenn. 1969)). Following this guiding principle, we have held that "[a]n employer is responsible for workers compensation benefits . . . if employment causes an actual progression or aggravation of the prior disabling condition or disease which produces increased pain that is disabling." Hill, 942 S.W.2d at 488; see also White v. Werthan Indus., 824 S.W.2d 158, 160-61 (Tenn. 1992) (upholding award of compensation to employee with pre-existing back condition where a fall at work rendered him "virtually immobilized by pain," even though the medical expert "could not express a medical opinion as to increased anatomical injury").

The confusion in this area has manifested itself in cases such as this, which involve the aggravation of pre-existing arthritic conditions. In Cunningham v. Goodyear Tire & Rubber Company, 811 S.W.2d 888 (Tenn. 1991), for example, an employee sought to recover for the aggravation of his pre-existing osteoarthritis. As in the present case, the underlying condition was asymptomatic until the employee started performing "hard labor" for the employer. Id. at 890. The medical evidence showed that while the cause of osteoarthritis was unknown, strenuous physical activity could exacerbate the condition. Id. Cunningham, whose job required him to lift and carry heavy objects, became physically disabled to the point of requiring the use of a wheelchair. Despite the acceleration of his osteoarthritis to such a debilitating extent, along with physical changes to his joints documented by x-rays, he was denied benefits. Citing to Smith's Transfer, the majority found that Cunningham's work duties aggravated his pre-existing condition by making the pain worse, but

6

it did not otherwise advance the severity of his osteoarthritis. Id. at 891. The Court held that "[w]here the employment does not cause an actual progression or aggravation of the underlying disease, but simply produces additional pain, there is substantial authority that a claim is not compensable when the disease itself . . . originated in conditions outside the employment." Id. at 890.

In dissent, Justice Martha Craig Daughtrey observed that the majority had properly concluded that work injury causing a mere increase in pain is not compensable. Id. at 891 (Daughtrey, J., dissenting). However, she criticized the majority for only applying the first part of the rule from Smith's Transfer. Id. The second part of that rule permits recovery when the work injury advances the severity of the condition, or results in a disabling condition other than increased pain. Id. (citing Smith's Transfer, 735 S.W.2d at 225-26). Justice Daughtrey opined that because Cunningham became "the victim of virtually complete physical debilitation, as the result of osteoarthritis aggravated by the conditions of his employment," there was "simply no way to conclude that [he] was suffering from merely an 'increase in pain.'" Id. at 894.

Subsequent to Cunningham, benefits have been awarded for the aggravation of pre-existing arthritic conditions. For example, in Sweat v. Superior Industries, Inc., 966 S.W.2d 31 (Tenn. Workers' Comp. Panel 1998),[3] the Appeals Panel affirmed the trial court's finding that the employee's pre-existing arthritis was aggravated by his employment. As in this case, Sweat had no symptoms of the disease until after he began working for the employer. Likewise, a physician testified that his work activities "advanced and resulted in actual progression of his underlying" arthritic condition. Id. at 32. Although another doctor expressed the view that Sweat's job activities were unrelated to his condition, the Appeals Panel emphasized that he was asymptomatic prior to performing the tasks assigned by the employer. The Appeals Panel also observed that "[t]here being no way [to] quantify how much worse his condition was made by his work, . . . the employer must bear the burden of any uncertainty." Id. at 34.

More recently, in Mathenia v. Milan Seating Systems, 254 S.W.3d 313 (Tenn. Workers' Comp. Panel 2007), our Appeals Panel once again affirmed an award of benefits where the employee aggravated pre-existing osteoarthritis in her thumb. Although the physicians agreed that Mathenia had osteoarthritis that pre-dated her employment, they differed as to whether her work activities aggravated the condition. One physician testified that "while her work and activities might have caused her an increase in her discomfort, I'm unaware of any specific anatomic change that would have either caused or aggravated that condition." Id. at 316. A second physician, however, testified that if she was completely pain free prior to her work injury, and otherwise experienced no symptoms of arthritis, "I would suspect that the injury at work may have caused her problem." Id. at 319. He added that Mathenia's work "could have initially caused some damage to the joint that

---

[3] Opinions of the Supreme Court's Special Workers' Compensation Appeals Panel may be published in the official reporter by order of a majority of the Court. Tenn. Sup. Ct. R. 4(A)(3). Published opinions "shall be considered controlling authority for all purposes unless and until such opinion is reversed or modified by a court of competent jurisdiction." Tenn. Sup. Ct. R. 4(G)(2).

over time, symptoms started occurring and with an arthritic joint, usually repetitive activity or stress through that area, will cause discomfort and pain." Id. Finally, a third physician testified that "[t]here is no way to know [whether [Mathenia's] work caused anatomical change] except that we know that to have increased pain, something has to change anatomically to cause that pain . . . and so on that basis, a good argument could be made by inductive reasoning that there has been some change." Id. Based on this evidence, the Appeals Panel affirmed the award of benefits to the employee.

In light of these disparate results under similar circumstances, we are resolved to provide some clarity for the trial courts. We believe that our holding in Smith's Transfer, which we have cited with approval on numerous occasions, see, e.g., Townsend, 826 S.W.2d at 436, provides the proper framework where an employee seeks compensation on the grounds that a work injury has aggravated a pre-existing injury or condition. We reiterate that the employee does not suffer a compensable injury where the work activity aggravates the pre-existing condition merely by increasing the pain. However, if the work injury advances the severity of the pre-existing condition, or if, as a result of the pre-existing condition, the employee suffers a new, distinct injury other than increased pain, then the work injury is compensable.

**Analysis**

Guided by these principles, we turn to our analysis of the circumstances of this case. The Employer insists that the Panel's opinion reversing the judgment of the trial court should be affirmed because the evidence failed to establish a causal connection between the Employee's work activities and any aggravation of the pre-existing arthritic condition. More specifically, the Employer argues that to the extent the Employee's work activities have aggravated his underlying condition, they have caused only an increase in pain which, as we have acknowledged, is not by itself a compensable injury.

The issue here, of course, is not whether the Employee's job responsibilities caused his bilateral carpometacarpal osteoarthritis. The medical evidence demonstrates that it did not. Rather, the dispositive question is whether the Employee's work caused only an increase in the severity of his pain, such that he should be deprived of benefits. The trial court, which accredited the lay testimony of the Employee as to the nature of his injuries, did not believe so, and neither do we.[4]

Although the medical evidence is conflicting, which is not unusual in litigation of this nature, we cannot say that the trial court erred by accrediting the testimony of Dr. Kennedy. Based upon his examination and testing of the Employee, as well as his review of the medical records, including x-

---

[4] In Williams v. Tecumseh Products Co., 978 S.W.2d 932, 935 (Tenn. 1998), we held an employee's "very credible testimony," as determined by the trial court, "bolstered the medical evidence of causation. Given this determination of credibility and the trial court's careful review of the medical evidence, we cannot say that the evidence preponderates against the trial court's finding . . . ." Further, "an award may be based upon medical testimony that [the employment] 'could be' the cause of the employee's injury, when there is also lay testimony from which it reasonably may be inferred that the [employment] was in fact the cause of the injury." Resser v. Yellow Freight Sys., Inc., 938 S.W.2d 690, 692 (Tenn. 1997).

8

rays taken before and after the surgeries, Dr. Kennedy concluded that the Employee had severe osteoarthritis in both of his thumbs, and that the cumulative trauma of his work aroused the condition "from dormancy into a regularly painful reality." Dr. Kennedy further determined that the Employee's work activities "permanently aggravated and advanced [the] pre-existing, underlying carpometacarpal osteoarthritis in both of his thumbs and caused the painful instability of those joints which ultimately necessitated" the surgeries in 2004 and 2005. Dr. Kennedy observed that it was more likely than not that the job responsibilities necessitated the surgeries, and that the osteoarthritis "would not have been advanced or aggravated to the extent that it was" but for his activities at work. When asked what he specifically meant by "aggravated," Dr. Kennedy explained that the job duties gradually stretched and loosened the thumb ligaments and over a period of time caused a deterioration of the cartilage between the bones.

In addition, Dr. Kennedy attributed the Employee's diminished ability to spread his thumbs apart from his hands "to the injuries that he had suffered to the bases of both of his thumbs." It was his opinion that there were times when the Employee's work responsibilities sorting and stacking lumber "aggravate[d] and advance[d] the subluxation or partial dislocation and osteoarthritis of both of his thumbs." When asked to state the effect on his condition of repetitively carrying the buckets of chemicals over a several year period, Dr. Kennedy responded that such activity "would have increased the forces conducted through the bases of his thumbs and would reasonably have been expected to aggravate and advance the osteoarthritis." He also believed that the surgical fusion of the joints in the Employee's thumbs "increased the normal biomechanical forces" in his thumbs, making him more vulnerable to injury. Finally, he assigned anatomical impairments of 8% to each hand, and recommended that the Employee permanently avoid "vigorous pushing or pulling, or rapid, repeated motions with either of his hands." Moreover, Dr. Kennedy opined that the Employee could not "be expected to carry out maximum gripping or pinching with either hand," or lift or carry twenty pounds occasionally, ten pounds frequently with two hands, or five pounds with one hand. Restrictions such as these, of course, are significant for a person who has spent his working years performing manual labor.

Although Dr. Fadel, in particular, disagreed with Dr. Kennedy's conclusion that the Employee's work aggravated his pre-existing arthritic condition, he did concede that if he had actually treated the Employee he "would understand more of his disease and what's going on in the process." Unlike Dr. Kennedy, Dr. Fadel never examined the Employee. Dr. Burns' testimony was not particularly helpful to either side. He acknowledged, however, that the Employee's job responsibilities, along with other activities, would cause the arthritic condition to worsen. Our examination of the record confirms that Dr. Kennedy's findings, which were based not only upon his own administration of tests but also his first-hand observations of the Employee, were more detailed than that of the other physicians who testified. He specifically described anatomical changes in the hands that he attributed to the nature of the work.

As stated, an employer takes every employee "as is." Hill, 942 S.W.2d at 488; see 82 Am. Jur. 2d Workers' Compensation § 300 (2008). Further, an injury may be compensable whether sudden or gradually developed over time. Burney, 377 S.W.2d at 948-50. Absolute certainty is not

required in a workers' compensation claim; benefits may be awarded where the medical evidence suggests that the employment may have been the cause of injury and there is also lay testimony, particularly if it is corroborative of a medical opinion rendered by deposition, from which causation may be inferred. See Crew, 259 S.W.3d at 664-65. Thus, the Employee's testimony merits consideration. One of his assignments was to work outdoors – rapidly and continuously removing heavy boards by hand from a conveyor and sorting and stacking them by grade. It was during this time that he first began to develop any pain in either hand. Later, his assigned responsibilities required him to lift forty-five to seventy pound buckets to shoulder level. The wire handles on the buckets rested directly on his thumbs, causing "sharp pain" with each lift. That his job duties required him to fill approximately 100 empty tubes with a chemical filler each hour of an eight-hour shift is not in dispute. The Employee also testified, without contradiction, as to the extent of his limitations, stating that at the time of trial he could not fully extend his thumbs, had trouble making a pinching motion, and had diminished grip strength. Because of continuing pain in his hands, he could no longer perform ordinary outdoor chores, hobbies, or simple tasks such as grooming his hair or brushing his teeth. His medical history corroborates that he first experienced the pain, numbness, and tingling in both of his thumbs when he was required to stack heavy boards, thus lending support to the medical assessment by Dr. Kennedy.

Based upon our independent review of the medical depositions and the other proof offered at trial, we are persuaded that the evidence does not preponderate against the finding of the trial court that the Employee suffered a compensable injury to his hands. Although the evidence of causation is particularly close, the lay testimony in conjunction with the medical evidence is sufficient to establish that the Employee's work activities did not merely increase the pain in his hands, but advanced the severity of his pre-existing arthritic condition. To the extent that reasonable doubt may exist on this point, our law requires an interpretation favorably to the Employee. E.g., Wilhelm, 235 S.W.3d at 127. That view is consistent, of course, with the remedial nature of the Workers' Compensation Act.[5]

For the reasons that the Employer argued the claim was not compensable, the Employer contends that the trial court erred by awarding temporary total benefits for missed work as the result of the surgeries to each hand. The Employer also maintains that the award of 40% to each hand was excessive. We have determined that neither of these arguments has merit. Finally, the Employee contends for the first time in this Court that the trial court's judgment mistakenly awarded 120 weeks of benefits rather than 160 weeks of benefits, and that the judgment should be corrected. This is an issue of fact and was never brought to the trial court's attention. Upon remand, the Employee may direct the merits of this claim to the trial court.

---

[5] "Tennessee Code Annotated section 50-6-116 declares the Workers' Compensation statute to be remedial in nature, and directs that the statute 'shall be given an equitable construction by the courts, to the end that the objects and purposes of this chapter may be realized and attained.' Accordingly, these laws should be rationally but liberally construed to promote and adhere to the Act's purposes of securing benefits to those workers who fall within its coverage." Martin v. Lear Corp., 90 S.W.3d 626, 629 (Tenn. 2002) (citations omitted).

**Conclusion**

In this instance, the trial judge, having seen the Employee and heard his testimony first hand, was in the best position to evaluate credibility. Because the medical evidence does not preponderate against the finding of causation and the award of benefits, we reverse the decision of the Appeals Panel. The case is remanded for any further proceedings which may be necessary. Costs on appeal are assessed against the Employer, Armstrong Woods Products, for which execution may issue if necessary.

_____

GARY R. WADE, JUSTICE