**Virgil L. HENLEY, Appellee,**

**v.**

**ROADWAY EXPRESS, Appellant.**

Supreme Court of Tennessee,
at Knoxville.

Oct. 21, 1985.

David P. Hawley, Ben Duggan, Chattanooga, for appellant; Duggan, McDonald & Hawley, of counsel.

J. Troy Wolfe, Carla A. Hudson, Chattanooga, for appellee; Wolfe & Hudson, of counsel.

## OPINION

FONES, Justice.

This is a direct appeal in a worker's compensation case by the employer from a decree awarding plaintiff, the employee, 75% permanent partial disability of the body as a whole. The determinative issue is whether plaintiff's mental disorder, depressive neurosis, which was alleged to have been caused or aggravated by third shift work and an inability to sleep in the daytime, arose out of and in the scope of his employment.

The material facts are not in dispute. During the years relevant to this litigation, plaintiff was employed as an OS and D clerk. As such, he dealt with the movement of freight that was over, short, damaged, or in distress, and located in the Chattanooga terminal of Roadway Express.

In July 1981, the trucking industry was experiencing a poor year, and the Chattanooga terminal had considerably less freight moving through its terminal than in prior years. Defendant found it necessary to lay off a number of dock workers and to reduce its clerical staff. The terminal operated twenty-four hours per day and had three OS and D clerks. Other terminals in the company with similar volume were operating with one or two OS and D clerks, and the decision was made to eliminate one of the three at the Chattanooga terminal.

In July 1981, one of the three OS and D clerks was terminated and plaintiff was required to work the so-called third shift from 11:00 p.m. to 7:30 a.m. At that time plaintiff had been employed by defendant for approximately fourteen years. Dick Ryan, the other OS and D clerk, had worked for Roadway Express only for approximately ten years. However, the two persons who supervised the OS and D clerks and the terminal manager reviewed the performance of plaintiff and Ryan and determined that Ryan was the more versatile employee and better able to handle the daytime duties of the OS and D clerk than plaintiff. During normal business hours, the OS and D clerk had considerable direct contact with customers while the night shift clerk had very little contact with customers. This was apparently the principal area in which Ryan's performance was superior to plaintiff's.

Plaintiff testified that when he first worked for defendant as a billing clerk he was on the 4:00 p.m. to midnight shift and had been on the 8:00 a.m. to 5:00 p.m. shift for a number of years prior to July 1981. He testified that after assignment to the third shift he could not sleep. He described his problem as follows:

A I could not sleep during the day. I would lay there, my mind would race continuously. I heard every noise that went on. I heard every car that passed. I heard the clock tick, I heard the refrigerator run, I heard everything all day long.

Q About how much were you sleeping? What was an average night's sleep, or day's sleep?

A An average day's sleep for me was cat naps, not more than forty-five minutes to an hour long.

Q So, in other words, you slept how much?

A I dozed off, basically, forty-five minutes to an hour daily.

Q That's all the sleep you were getting—

A Yes.

Q—was forty-five minutes to an hour a day?

A Yes.

Q All right. What was the effect of the lack of sleep?

A The effect of it was that I became mentally and physically—physically worn out. I started having physical problems that I had never had before.

Q What kind of problems?

A I was scared, my heart palpitated, I had chest pains, I had arthritic pain, I hurt from the top of my head to the toes on my feet.

Q Okay, besides the physical problems, did you experience any other kinds of problems?

A Yes, I became deprogrammed. I lost assertion. I could not think I could not remain stable, I could say yes one minute and no the next. I was happy, sad, continuously, nothing—nothing, I felt nothing at the end. I couldn't sleep day or night. I am still affected by it.

Plaintiff went to Dr. McClure for a general physical exam. According to plaintiff, Dr. McClure could not find anything physically wrong with him and recommended he see a psychiatrist.

Plaintiff testified that he "could not accept that anything was wrong with my mental and emotional status, it was my body that was hurting me." He obtained a letter from Dr. McClure to defendant wherein the opinion was expressed that plaintiff was suffering from "a stress exhaustion syndrome brought on by an inability to adjust to night shifts" and it was recommended that he be allowed to work a regular daytime or evening shift.

Plaintiff went to the terminal manager, told him about his inability to sleep in the daytime and discussed going on another shift; but defendant informed him that it had explored all possibilities but was unable to change his hours.

Two or three months prior to July 1983, plaintiff's working hours were changed from 11:00 p.m. to 7:30 a.m. to 12:00 p.m. to 8:30 a.m. to overlap the other OS and D

clerk because of the necessity that they communicate in person about the status of OS and D freight. Plaintiff's two supervisors, James Green and David Thompson, testified that plaintiff had never complained about his hours of work prior to the time his shift was backed up one hour but when informed of the change immediately protested and said he would not work that shift.

Tony Richmond, the terminal manager, testified that he conferred with plaintiff about a shift change in July 1983 and that, when he informed plaintiff that the company could not change the hours, plaintiff asked to be terminated. Richmond suggested that he take the rest of the week off to think it over. On the following Monday, plaintiff asked Richmond to be terminated and was told that the company had no reason to discharge him and that, if he could not work the 12:00 p.m. to 8:30 a.m. shift, he would have to resign. Plaintiff told Richmond that he wanted to be terminated so that he could get unemployment compensation.

However, plaintiff returned to work on the 12:00 p.m. to 8:30 a.m. shift. On October 13, 1983, he went to Dr. William Dowell, an internist. He was hospitalized for two days and a complete physical check-up was performed. Doctor Dowell testified that the cardiograms, x-rays, lab work, etc. revealed no significant physical findings and that plaintiff's problems were related to his emotional troubles. Doctor Dowell testified that plaintiff was depressed to the point that "he might even be a potential suicide; that his depression caused insomnia and inability to sleep, which in turn produced fatigue." He was asked and answered as follows:

Q He gave you a history of inability to sleep?

A Insomnia and inability to sleep.

Q Is that what you concluded produced the fatigue?

A Yes, sir, I thought so, and I thought this was part of his depression. This is a very, very common finding in patients that are severely depressed. They are unable to rest. It is what is probably the most common symptom we see in depressed patients.

Doctor Dowell recommended plaintiff seek psychiatric help.

Plaintiff testified he called Valley Psychiatric Hospital for an appointment, saw Dr. William Harris and Dr. Ross Campbell and was admitted to the hospital. Doctor McClure, Dr. Harris and Dr. Campbell were not called as witnesses. The only medical witness that testified was Dr. Dowell. A clinical psychologist, William Harrison, Ph.D., also testified. Harrison said that he saw plaintiff for the first time on November 1, 1983, at Valley Hospital and evaluated him as having a depressive neurosis, also called a dysthymic disorder.

Plaintiff was in the Valley Hospital forty-two days. Harrison testified plaintiff received four types of therapy, chemotherapy or medication which Dr. Campbell handled, individual psychotherapy, group therapy and Milieu therapy, which consisted of classes on stress, divorce and so forth. Plaintiff improved after just one week of a change of sleep pattern. After his release from the hospital, Harrison had recommended he receive one session a week of psychotherapy; and at the time of trial, plaintiff testified, he was receiving psychotherapy every two weeks.

On January 5, 1984, Harrison wrote to plaintiff and advised that plaintiff was "able to participate in the normal stress levels of work, but I also feel that the probability of a relapse would be increased if Virgil were to return to his third shift schedule." Doctor Dowell addressed a similar communication to defendant, saying plaintiff could return to work on January 2, 1984, but cautioning that "having to assume a third shift schedule may cause a recurrence of his recent illness."

Defendant advised Drs. Dowell and Harrison that they could not allow plaintiff to return to work unless they received an unconditional release. Both Dowell and Harrison responded with the same opinions about the third shift work originally expressed. Whereupon, plaintiff and defend-

ant returned to their respective positions taken in July 1983, to-wit: plaintiff contending that he would not work the 12:00 p.m. to 8:30 a.m. shift and demanding a termination if he could not be provided with a job on the daytime or evening shift, and defendant insisting that if plaintiff could not work that shift he would have to resign. Thereafter plaintiff began looking for other employment and filed a claim for unemployment compensation.

At trial, plaintiff testified that he was currently employed at Bachman Children's Home as a house parent. He was required to live in a dormitory with boys in the sixteen to seventeen years age range "overseeing them."

Plaintiff married his first wife in 1962. They had one child born in 1963 or 1964. His wife returned to her home in Texas to have the child and never returned to Tennessee. She obtained a divorce in Texas apparently sometime in the sixties. Plaintiff has only seen his daughter once or twice in the past ten years. In 1980 or 1981, his daughter came to Tennessee to visit him, apparently at his request and his expense; arrived at midnight and returned to Houston the next day. Plaintiff married a second time in February 1980 and was divorced in 1982. Harrison testified on cross examination that plaintiff told him he had contemplated suicide before he went on the night shift. Harrison was reluctant to admit that anything other than third shift work caused or contributed to plaintiff's depression but finally acknowledged that his divorces "did compound his social isolation, did compound his stress." Harrison also testified as follows:

Q Well, do you remember the deposition you gave, doctor?

A Yes, I do.

Q I asked you this question on page sixteen: "So you took him at his word that his stress problem was due to his job rather than any other circumstances, including his marital problems? Answer: Right. Question: So he kind of judged his own situation rather than you judging him. Is that right? Answer: Well,

he judged the situation and I agreed with him. Question: So, you didn't judge his condition; he told you and you just said, 'Well, that must be right.'" Is that correct?

A He had a great deal of logic behind his assessment of the situation. I felt it to be correct with the information or you could say with the support that he gave me at that time. In other words, he was aware of his situation.

Later, on cross examination, Harrison was asked and responded as follows:

Q And you can't say, since you are not familiar with the working activities of Roadway Express, you are not in a position to say that any one shift is more stressful than any other shift out there in the twenty-four hour period, are you?

A As far as the actual work demands of that, according to Virgil's reports again, the actual stress of the shift did not seem to be a factor. The timing of the shift did.

The complaint in this case alleges that plaintiff developed an occupational disease "within the meaning and confines of T.C.A. § 50–6–301" and that while working on a third shift he developed sleeping difficulties, requested reassignment to the first or second shift, which was refused, and as a result he developed a depressive neurosis and other somatic problems and has a permanent disability.

The trial judge, in delivering his opinion from the bench, made no mention of occupational disease and stated the issue to be whether or not the plaintiff's problem arose out of and in the course of plaintiff's employment. He cited and quoted from *Bell v. Kelso Oil Co.*, 597 S.W.2d 731 (Tenn.1980); *Jose v. Equifax Inc.*, 556 S.W.2d 82 (Tenn.1977); and *Electro-Voice, Inc. v. O'Dell*, 519 S.W.2d 395 (Tenn.1975), whereupon he concluded as follows:

In this case, it appears that the plaintiff was required to work on the third shift, with all the problems that working a third shift carries with regard to sleeping and resting during daylight hours. The plaintiff was unable, for one reason

or another, to sleep or rest during daylight hours, which resulted in him being physically exhausted and led to the development of a severe depression and a subsequent nervous breakdown and mental impairments resulting therefrom.

In the court's opinion, the nervous breakdown was caused by his working on the third shift, which was a condition of employment under which he worked, and therefore arose out of his employment and he is entitled to recover worker's compensation benefits for the disabilities resulting therefrom.

The expression "nervous breakdown" was not articulated by either Dr. Dowell or Dr. Harrison.

In *Jose*, the Court affirmed the trial judge's dismissal of plaintiff's worker's compensation suit for failure to state a claim and the opinion provides no authority for a legal conclusion that this plaintiff's mental disorder is compensable. The two sentences quoted by the chancellor followed the Court's comments about an article by Professor Larson wherein he had pointed out that courts have not hesitated to award compensation for mental or nervous disorders where a traumatic work related injury was proven but were reluctant to permit recovery where only a mental stimulus, occurring on the job, caused the alleged mental disorder. It was then, and in that context, that the statements relied upon by the trial judge appeared, to-wit:

This Court is not inclined to limit recovery to cases involving physical, traumatic injury or to impose any other artificial limitation upon the coverage afforded by the compensation statutes. In proper cases, we are of the opinion that a mental stimulus, such as fright, shock or even excessive, unexpected anxiety could amount to an "accident" sufficient to justify an award for a resulting mental or nervous disorder. 556 S.W.2d at 84.

Immediately following those two sentences, the Court continued as follows:
It must be recalled, however, that the Tennessee statute, unlike the statutes of several other states mentioned in the Larson article, confines recovery to "injury by accident arising out of and in the course of employment." *Id.*

The final caveat in *Jose* was as follows:
A liberal interpretation has been given to the statutory criterion of "injury by accident," [citations omitted] but this still does not embrace every stress or strain of daily living or every undesirable experience encountered in carrying out the duties of a contract of employment. *Id.*

*Jose* received further clarification in *Allied Chemical Corporation v. Wells*, 578 S.W.2d 369 (Tenn.1979). In *Wells*, the Court said that the employee's basic contention was that his heart attack was caused or contributed to by mental strain and anxiety created by his working conditions. Whereupon the Court said:

While this Court recognized in the case of *Jose v. Equifax, Inc.*, 556 S.W.2d 82, 84 (Tenn.1977), that mental stimulus, such as fright, shock, or excessive unexpected anxiety resulting in injury might justify a compensation award, the present claim goes beyond the parameters suggested in that case. On the date of his initial heart attack, and for several weeks prior thereto, appellee points to no particular incident or episode, physical or mental, as having triggered or precipitated the onset of his heart attack, which resulted in a myocardial infarction. Rather, it is insisted that chronic stress, emotional strain and worry over his job responsibilities and conditions were the precipitating cause, and that his resulting myocardial infarction constituted an industrial "accident" sufficient to support a compensation award. 578 S.W.2d at 370.

In short, in *Wells* we held that worry, anxiety or emotional stress of a general nature are not in and of themselves sufficient to establish an accident and concluded with the following:
[B]ut there are obviously limits to any realistic application of the criterion of "injury by accident." Emotional stress, to some degree, accompanies the performance of any contract of employment.

When this is "within the bounds of the ups and downs of emotional normal human experience" courts frequently decline to impose liability upon employers for conditions resulting from "cumulated" strain. *See generally* 1B A. *Larson, Workmen's Compensation Law,* p. 7–152 (1978). *Id.* at 373.

*See also* an analysis of *Jose* and *Wells* in *Cabe v. Union Carbide Corp.,* 644 S.W.2d 397 (Tenn.1983).

■ Thus it is clear that plaintiff's claim must be rejected because it is beyond the reasonable limits of the statutory criterion of injury by accident.

■ In addition, plaintiff's proof is insufficient to meet the tests of "arising out of" and "in the course of" employment. Plaintiff's claim is predicated upon the effect that his hours of employment had upon his home life and personal activities, principally his problem with sleeping in the daytime, although it is obvious that during most of the year he has five to six hours of night time available for sleep.

We have repeatedly said that to satisfy the requirement "arising out of" employment it must be shown that the injury was caused by a hazard incident to the employment and that, to satisfy the requirement of "in the course of" employment, it must be shown that at the time and place of the injury the employee was performing a duty he was employed to do. *See Hudson v. Thurston Motor Lines Inc.,* 583 S.W.2d 597 (Tenn.1979) and *Travelers Insurance Co. v. Googe,* 217 Tenn. 272, 397 S.W.2d 368 (1965).

Clearly, it would require expansion beyond reasonable limits to find that the inability to sleep at home between the hours of eight-thirty a.m. and twelve p.m. was in the course of performing a duty plaintiff was employed to do or was a hazard incident to the employment environment.

In *T.J. Moss Tie Co. v. Rollins,* 191 Tenn. 577, 235 S.W.2d 585 (1951), and in numerous cases before and since, this Court has said:

An injury arises out of the employment when there is apparent to the rational mind upon consideration of all the circumstances a causal connection between the conditions under which the work is required to be performed and the resulting injury. 191 Tenn. at 581, 235 S.W.2d at 586.

■ We are unwilling to find that the shift or hours that an employer has available for an employee can be said to provide a causal connection between "the conditions under which the work is performed" and an employee's inability to discipline his personal life. We find that plaintiff has not proven an injury by accident arising out of and in the course of his employment.

For the reasons discussed above, plaintiff has also failed to prove that he has sustained an occupational disease arising out of and in the course of his employment, if indeed he has shown that he suffers from an occupational disease.

■ There is a further fatal infirmity in the proof adduced by plaintiff in this case. There was no medical testimony that plaintiff has a permanent disability or the degree thereof. Harrison, the clinical psychologist, was the only witness offered who expressed an opinion about the permanency or the extent of disability of plaintiff's alleged mental disorder.

We have held in numerous cases that expert medical testimony is required to establish the permanency of an injury except where the permanent disability is obvious to a layman, such as an amputated leg. In *Freemon v. VF Corp., Kay Windsor Div.,* 675 S.W.2d 710 (Tenn.1984), we expressly held that a psychologist was not a medical doctor and was not qualified to establish the permanence of an injury in a worker's compensation case. Doctor Dowell was the only medical witness offered and he was not asked, nor did he voluntarily testify, about the permanency or the extent of any disability of plaintiff.

The result is that the decree of the trial court is reversed and this case is dismissed at plaintiff's costs.

COOPER, C.J., and BROCK, HARBISON and DROWOTA, JJ., concur.