IN THE SUPREME COURT OF TENNESSEE
AT JACKSON
April 1, 2008 Session

## LACAY CREW V. FIRST SOURCE FURNITURE GROUP d/b/a ANDERSON HICKEY COMPANY

Appeal by permission from the
Supreme Court Special Workers' Compensation Appeals Panel
Lauderdale County Chancery Court
No. 12958-38-69    Dewey Whitenton, Chancellor

No. W2006-00713-SC-WCM-WC - Filed June 24, 2008

In 2004, the plaintiff, Lacay Crew, filed a workers' compensation claim alleging injuries to her left and right hands, wrists, and arms, while in the course and scope of her employment. In response, the defendant, First Source Furniture Group, d/b/a Anderson Hickey Company, denied the claim on issues of causation. The trial court found that Crew sustained a compensable, gradual injury to both upper extremities and awarded a permanent partial vocational disability of 25% to each upper extremity equating to a judgment award of $25,479.00. Discretionary costs in the amount of $150.00 were awarded for reimbursement to Crew for a doctor's completion of a Tennessee Department of Labor Form C-32 on Crew's behalf. The Special Workers' Compensation Appeals Panel found that there was insufficient evidence of causation and dismissed the case. We affirm the decision of the Appeals Panel.

**Tenn. Code Ann. § 50-6-225(e); Findings of Fact and Conclusions of Law of the Special Workers' Compensation Appeals Panel Affirmed.**

GARY R. WADE, J., delivered the opinion of the court, in which WILLIAM M. BARKER, C.J., and CORNELIA A. CLARK, and WILLIAM C. KOCH, JR., JJ., joined. JANICE M. HOLDER, J., not participating.

S. Newton Anderson and Gayle B. Lakey, Memphis, Tennessee, for the appellant, First Source Furniture Group d/b/a Anderson Hickey Company.

Steven C. Grubb, Memphis, Tennessee, for the appellee, Lacay Crew.

**OPINION**
**I. Facts**

Lacay Crew ("Crew"), who was 39 years of age at the time of trial, is a high school graduate. She attended college for a time, studying voice range and music. Her work career began with packing automobile parts at Tennessee Electroplating for approximately six months and putting parts on the line for motors for fans at Magnetek Universal Electric. She began working for First Source Furniture Group, d/b/a Anderson Hickey Company ("Anderson Hickey") in 1991, where she operated a break press. Her job required that she bend parts that would later be used to assemble desks. In 1995, she left Anderson Hickey and became a substitute teacher. In 1999, when she returned to Anderson Hickey, she was initially assigned to the welding department, where she assembled filing cabinets and later began to assemble desks on the line.[1] She worked there continuously until January 28, 2002, when she was permanently laid off. Anderson Hickey's plant closed two months later.

In October 2001, during the time in which she was working in desk assembly, Crew used a rubber hammer weighing approximately five pounds to bend drawers in order to assure a proper fit. When a desk on the moving assembly line lacked all of the necessary parts, Crew, with the help of others, would lift as much as 200-300 pounds of weight. Her work was varied and included welding and working on the hang line lifting files. On her own, she could lift approximately 30 to 40 pounds.

On October 13, 2001, Crew noticed that her wrist was swollen. Ten days later, the swelling was worse. She reported her condition to her supervisor because she could not remove her ring from her finger. Anderson Hickey referred her to a Dr. Robbins.

Before being treated by Dr. Robbins, Crew completed a workers' compensation questionnaire. She reported that she lifted items from the floor to the "peds," helped to fit drawers on a desk line "in an upward [and] downward motion all day," and "notice[d] tingling in [her] fingers and also swelling of the fingers [and] wrist." During the course of treatment on her left wrist, Crew began to experience pain in her right wrist as well. Dr. Robbins, who last saw Crew in December of 2001, authorized her return to work with a ten pound lifting restriction. Ultimately, he referred her to a Dr. Carl Huff, an orthopedic surgeon.

On December 21, 2001, Crew had her first appointment with Dr. Huff. She complained at that time of numbness in her left hand and a gradual onset of symptoms occurring in the previous two months associated with repetitious use of her hand at work. She also reported that she had been wearing a brace and using medications. Dr. Huff found that Crew had nearly a full range of motion

---

[1] Crew testified on direct examination that she came back to Anderson Hickey in 1999 in the welding department and that she did that "[u]p to 2002" for "about a year and a half." She also stated that she went back in "about '97, '98" in "desk assembly."

but tested positive on both a Phalen's test[2] and Tinel's sign.[3] He also noted that she displayed a slight weakness of pinch and had decreased sensation in her thumb and fingers. Dr. Huff acknowledged that the validity of these results depends upon subjective responses from a patient to questions relative to sensation. Radiographs of Crew's left wrist were negative. Dr. Huff ordered an electromyogram ("EMG"), which measures the speed of the transmission of an electrical impulse along the path of the nerve, to determine whether Crew was suffering from carpal tunnel syndrome. He deemed the EMG as particularly reliable because it "doesn't require patient response." Dr. Huff returned Crew to work with a five-pound lifting limit, a repetitive work restriction, and a wrist immobilizer.

Three weeks later, Dr. Huff conducted a second examination. In the meantime, the EMG report indicated no carpal tunnel syndrome to the left upper extremity. On physical examination, however, Dr. Huff found "marked tenderness over the first dorsal extensor compartment at the wrist," "increased pain" in the same area, a diminished strength of pinch, and a negative Phalen's test and Tinel's sign over the median nerve. Crew's range of motion remained full. Dr. Huff diagnosed de Quervain's tendonitis[4] of the left wrist and ordered a cortisone shot, medications for pain, an immobilizer, and further testing. Because Crew was still complaining of some numbness in her left hand, Dr. Huff ordered lab testing for arthritic and rheumatological issues. He again returned her to work with the five-pound lifting restriction and repetitive work restriction.

When Crew returned to Dr. Huff on January 24, 2002, for a third visit, she reported that her grip and pinch had "definitely improved." Her examination showed minimal tenderness, her pinch and grip strength were near normal, and she had no loss of sensation. Dr. Huff prescribed an anti-inflammatory medication and returned her to work without restrictions.

One week later, Crew returned to see Dr. Huff complaining of pain in her left shoulder and right wrist and generalized pain in her joints. By then, Dr. Huff had the lab results for rheumatology, which indicated that Crew had lupus, an inflammatory arthritic condition. He noted pain and swelling in multiple parts of her body and stated that it was "possible" that her return to work at full duty had aggravated her condition. It was also his opinion that Crew would be permanently unable to resume repetitious work. Dr. Huff advised her to seek follow up care for her lupus from her primary care physician.

---

[2] Dr. Huff described the Phalen's test as "a compression test of the median nerve where the wrist is flexed for 60 seconds, and then they get a tingling in the distribution of the median nerve."

[3] Dr. Huff described the Tinel's sign as a "tap over the nerve" that results in a "radiating paresthesia in the distribution of the nerve."

[4] Dr. Huff described de Quervain's tendonitis as a "stenosing tenosynovitis of the extensor tendons to the thumb, actually the abductor pollicis longus and extensor pollicis brevis . . . . [a]s they course through the first dorsal extensor compartment, they get tightness and pressure and this causes pain when these tendons glide with movement." It is also known, among other things, as De Quervain's tenosynovitis and De Quervain's Syndrome. Tendonitis can also be spelled "tendinitis."

In December of 2002, Crew again saw Dr. Huff on a follow-up basis, complaining of numbness in the left hand and, for the first time, in the right hand. She also displayed triggering of her left middle finger, tenderness over the de Quervain's tendons of the left wrist, decreased sensation in her fingers, and a slight weakness of pinch in both hands. She reported a tingling paresthesia with the Phalen's test in both wrists. Dr. Huff ordered EMGs to both the left and right upper extremities, but released Crew to full duty with no restrictions.

On January 24, 2003, Dr. Huff determined that the EMG was negative as to both extremities "with no indication of carpal tunnel syndrome or other peripheral nerve entrapment." He found no specific pathological condition, a full range of motion, and normal pinch and grip strength, sensation, and circulation. He placed no restrictions and gave a full duty release. It was his opinion, based on a reasonable degree of medical certainty and any guidelines for impairment, that Crew had sustained "[n]o impairment." It was his further opinion that if she had left employment with Anderson Hickey and begun other work as a box assembler for nine months, that "the new job would have caused the carpal tunnel since her EMG, when I did it last was normal." Dr. Huff concluded that any disability to Crew's upper left extremity was the result of something "after she left my office."

On August 22, 2002, some eight months after being laid off by Anderson Hickey and when under the treatment of Dr. Huff, Crew visited Dr. John Janovich, an orthopedic surgeon.[5] Crew testified that she saw Dr. Janovich based on a referral from her sister. On that date she told him of the problems she was having with her hands, wrists, and arms. Dr. Janovich conducted some tests, but rendered no other treatment at that time.

After her employment ended at Anderson Hickey, Crew worked briefly at a Slim Fast plant, where she picked up and stacked cans eight hours a day, five days a week with some overtime. Beginning January 2003, she was employed for eight months by Paslode, making boxes and placing nails on a conveyor belt. On September 3, 2003, near the end of her employment at Paslode, Crew sought medical treatment for the first time since having last seen Dr. Huff. Dr. David West, an orthopedic surgeon, heard Crew's complaint about left and right wrist pain with some shoulder pain.[6] He noted a history of pain for approximately two years with negative EMGs on both upper extremities. Because of continuing symptoms and the passage of time, Dr. West conducted another EMG, which this time was positive for moderate carpal tunnel on the right wrist. Three weeks later, Dr. West performed right carpal release surgery on Crew's right wrist.[7] He later concluded that Crew had healed well and discharged her on November 18, 2003.

---

[5] None of Dr. Janovich's medical records provided include the August 2002 visit.

[6] Nothing in the record indicates that Crew sought any medical care for her bilateral upper extremity complaints from the time she left Dr. Huff's care on January 24, 2003 and her visit with Dr. West on September 3, 2003.

[7] Dr. West testified by deposition that the surgery was on January 24, 2003, but his medical notes indicate the date of procedure as September 24, 2003. In another part of his testimony, he stated that he provided treatment in September 2003.

Dr. West completed a Tennessee Department of Labor C-32 Form and opined that Crew sustained a 2% permanent physical impairment to a scheduled member. He determined that her impairment more probably than not arose out of her employment. By deposition, Dr. West acknowledged that he was aware that Crew's employment with Anderson Hickey was terminated in January of 2002, and was further aware that she worked at Paslode from January to September 2003. Dr. West, who was unable to determine to a reasonable degree of medical certainty which employer, Anderson Hickey or Paslode, was responsible for Crew's right carpal tunnel condition, observed as follows:

> The only true fact . . . is that you had a physician that examined her during the time she worked for Anderson Hickey, who did a detailed EMG nerve conduction study that revealed that she did not have carpal tunnel, by EMG. Whether she had numbness and pain and disability to her hand, I didn't examine her during that time, so I can't say. But the EMG was positive from the time that she left Anderson Hickey until when I saw her. That is the only true statement I know. And so you could assume that the patient developed carpal tunnel during that period, because the previous EMG was normal.

Upon being questioned as to the injury to Crew's right wrist, Dr. West said, "I think the fact is . . . that the patient developed a positive EMG within nine months of the normal one. So by assumption, that would mean that the second employer would have been at least the aggravating cause, if not the cause." He also stated that the repetitive type of work described as being Crew's duties at Paslode was the type of work that can commonly result in carpal tunnel syndrome, and that based on such a job description, it was likely that there was a progression and aggravation of Crew's right wrist injury. Although Crew was "having problems in terms of what she described" prior to seeing him and while employed at Anderson Hickey, Dr. West explained it did not "necessarily mean she had carpal tunnel."

In April of 2004, Crew returned to Dr. Janovich with a claim of left carpal tunnel syndrome. She saw him through November 10, 2004. Dr. Janovich completed a C-32 Form in support of her claim. He determined that Crew had pain and numbness in both upper extremities with tingling in the fingers and pain. He noted a positive Tinel's and Phalen's tests on both hands. He diagnosed bilateral carpal tunnel syndrome, bilateral cubital tunnel syndrome, chronic radial epicondylitis on the left, and tendonitis on the left and trigger finger. On April 19, 2004, Dr. Janovich performed an EMG on Crew. There was a positive result. Two months later he found the same positive Tinel's and Phalen's tests and carpal tunnel syndrome. On June 29, 2004, Dr. Janovich performed a left carpal tunnel release as well as a trigger finger release of the third and fourth digits on the left hand. After the surgery, Crew's symptoms continued, including a positive Tinel's over the ulnar nerve at her visit with Dr. Janovich in October of 2004. Crew was released from Dr. Janovich's care weeks later with a 5% permanent partial disability rating to her upper left extremity, with numbness of the ring finger on the left. Like Dr. West, Dr. Janovich checked the space in the C-32 Form affirming that "this injury more probably than not [arose] out of the [Plaintiff's] employment." Dr. Janovich offered no further proof as to causation.

At trial, Crew testified that when she began her job at Paslode, she was having the same problems with her wrists, hands, and arms that she previously had since October 2001, when she worked at Anderson Hickey. At one point, she stated that the swelling and numbness had stayed "the same way it was" when she first started having problems, and at another point, she testified that the condition "[g]ot worse" while working at Paslode. She explained that she stopped working at Paslode because of her hands, her last surgery, bad health, and "uncontrollable blood pressure."

Crew's husband, Donnie Crew, confirmed that she started having some problems with her hands and wrists while working for Anderson Hickey. He recalled that Crew had first complained about her left hand and then later complained about her right hand. He also recalled massaging her hands and when she returned from work because of swelling. Sandra McElrath, Crew's sister, testified that she saw swelling in her hands during the period she worked for Anderson Hickey and recommended that she see a doctor. McElrath testified that Crew wore a brace on her arm during that time, held her hands in a "certain position," and complained of numbness and tingling in her hands and wrists. Angela Currie, who also worked at Paslode, described Crew's job as building boxes, closing them, and having to "constantly" do it "all day long." When questioned about any changes in Crew's condition, Currie testified that during Crew's time at Paslode, she noticed that "it was getting worse on her," and that Crew had difficulty opening a door and holding anything without dropping it. She also testified that since Crew left the job at Paslode, her hands, fingers, and wrists were still swollen the same as when she was at Paslode.

The trial court found that Crew sustained a compensable gradual injury to her arms and wrists while employed with Anderson Hickey. The court considered the credible lay and medical testimony and awarded permanent partial disability to the right and left arm of 25%. It further found that the anatomical impairment was 5% to the left upper extremity, based on the opinion of Dr. Janovich, and 2% to the right upper extremity, as rendered by Dr. West. The trial court also awarded discretionary costs of $150 as reimbursement for the cost of completion of the Tennessee Department of Labor C-32 Form by Dr. David West.

The Workers' Compensation Panel reversed, finding that Crew had failed to establish causation through her employment with Anderson Hickey. The panel specifically found that both EMGs conducted by Dr. Huff showed no evidence of carpal tunnel syndrome in Crew's left or right wrists, and that her work at Paslode involved "the very types of repetitive motions that . . . could cause carpal tunnel syndrome."

## II.  Standard of Review

In Tennessee workers' compensation cases, this Court reviews the trial court's findings of fact de novo, accompanied by a presumption of correctness of the finding, unless the evidence preponderates otherwise. Tenn. Code Ann. § 50-6-225(e)(2) (2005 & Supp. 2007); Wilhelm v. Krogers, 235 S.W.3d 122, 126 (Tenn. 2007). "This standard of review requires us to examine, in depth, a trial court's factual findings and conclusions." Galloway v. Memphis Drum Serv., 822 S.W.2d 584, 586 (Tenn. 1991) (citing Orman v. Williams Sonoma, Inc., 803 S.W.2d 672, 675 (Tenn. 1991)). We give considerable deference in reviewing the trial court's findings of credibility and

assessment of the weight to be given to that testimony, when the trial court has heard in-court testimony. Whirlpool Corp. v. Nakhoneinh, 69 S.W.3d 164, 167 (Tenn. 2002). On questions of law, our standard of review is de novo with no presumption of correctness. Wilhelm, 235 S.W.3d at 126 (citing Perrin v. Gaylord Entm't Co., 120 S.W.3d 823, 826 (Tenn. 2003)). The extent of vocational disability is a question of fact to be decided by the trial judge. Johnson v. Lojac Materials, 100 S.W.3d 201, 202 (Tenn. 2001). Although workers' compensation law must be construed liberally in favor of an injured employee, it is the employee's burden to prove causation by a preponderance of the evidence. See Thomas v. Aetna Life & Cas. Co., 812 S.W.2d 278, 283 (Tenn. 1991).

### III. Analysis

Anderson Hickey first contends that the trial court erred in awarding Crew a 25% permanent partial disability to each arm. To support its argument, Anderson Hickey submits that (1) the trial court's finding that Crew's injuries to both upper extremities and the extent of the related impairment was caused by her employment with Anderson Hickey is not supported by the evidence; and (2) the trial court erred by failing to apply the "last injurious injury" rule in this case, which would preclude recovery from Anderson Hickey for any disability claims.

### A. Causation

Tennessee Code Annotated section 50-6-241 (2005) dictates that an employee who sustains a permanent partial disability as a result of a workplace injury is entitled to receive permanent partial disability benefits. The claimant in a workers' compensation suit has the burden of proving every element of his or her case by a preponderance of the evidence. Elmore v. Travelers Ins. Co., 824 S.W.2d 541, 543 (Tenn. 1992). To be compensable under workers' compensation law, an injury must "aris[e] out of and in the course of employment." See Tenn. Code Ann. § 50-6-102(13) (2005); Thornton v. RCA Serv. Co., 221 S.W.2d 954, 955 (Tenn. 1949). The phrase "arising out of" refers to the cause or origin of the injury and the phrase "in the course of" refers to the time, place, and circumstances of the injury. Hill v. Eagle Bend Mfg, Inc., 942 S.W.2d 483, 487 (Tenn. 1997). If it is apparent to the rational mind, after considering all of the circumstances that there is a causal connection between the conditions under which the work is required to be performed and the resulting injury, then such accidental injury "'arises out of one's employment.'" Wilhelm, 235 S.W.3d at 127 (quoting Fink v. Caudle, 856 S.W.2d 952, 958 (Tenn. Workers' Comp. Panel 1993)).

"We have held in numerous cases that expert medical testimony is required to establish the permanency of an injury except where the permanent disability is obvious to a layman, such as an amputated leg." Henley v. Roadway Exp., 699 S.W.2d 150, 155 (Tenn. 1985). While causation must be proven through medical evidence, "absolute certainty . . . is not required." Fitzgerald v. BTR Sealing Sys., 205 S.W.3d 400, 404 (Tenn. 2006). Benefits may be awarded, therefore, where medical evidence shows that the employment "'could or might have been the cause'" when there is also lay testimony from which causation may be inferred. Id. at 404 (quoting Clark v. Nashville Mach. Elevator Co., 129 S.W.3d 42, 47 (Tenn. 2004)). "If medical testimony is presented by deposition, this Court may make an 'independent assessment of the medical proof to determine where the preponderance of the evidence lies.'" Wilhelm, 235 S.W.3d at 127 (quoting Conner Bros. Excavating Co. v. Long, 98 S.W.3d 656, 660 (Tenn. 2003)). "Any reasonable doubt as to whether

the worker's injuries arose out of his employment must be construed in the worker's favor." Wilhelm, 235 S.W.3d at 127.

The trial court considered the deposition testimony of Drs. West and Huff, as well as the C-32 Forms that were completed by Drs. West and Janovich. It further heard testimony from Crew, her husband, sister, and long-time friend and found that Crew "sustained a compensable, gradual injury to both upper extremities arising out of and within the course and scope of her employment."

The Panel disagreed with the trial court's findings specifically as to causation:

> Our independent review of the record in this case shows that the plaintiff was not suffering from carpal tunnel syndrome in her left wrist as of January 7, 2002, when an EMG conducted by Dr. Huff showed no evidence of carpal tunnel syndrome. The EMG was performed less than one month prior to plaintiff's lay-off from her employment with Anderson Hickey. In addition, a second EMG conducted by Dr. Huff on January 14, 2003, showed no evidence of carpal tunnel syndrome in the plaintiff's left or right wrists. Only nine months later did the plaintiff have a positive EMG for carpal tunnel syndrome. This occurred after plaintiff had obtained employment through Paslode, at which her job duties were the very types of repetitive motions that, according to the medical proof in this case, could cause carpal tunnel syndrome. The generic statement checked by Dr. Janovich in the C-32 form is not sufficient to support a finding that the plaintiff sustained a compensable workers compensation injury with the defendant. Moreover, the plaintiff's complaints of swelling in her left and right wrists prior to the positive EMG through Dr. West's office have an independent medical explanation–her diagnosis of inflammatory arthritis or lupus.

Prior case law is helpful to our determination of whether the injury qualifies as "arising out of" and "in the course of" Crew's employment. This Court in Glisson v. Mohon International, Inc. considered whether an injury arose out of the employment. 185 S.W.3d 348, 354 (Tenn. 2006). We reasoned that "except in the most obvious cases, causation must be established through medical evidence." Id. (citing Orman, 803 S.W.2d at 676). We also emphasized the importance of the C-32 Form in support of a medical report in workers' compensation cases. Id. at 354 n.3. We stated that "[a]lthough causation cannot be based upon speculative or conjectural proof, absolute medical certainty is not required, and reasonable doubt must be resolved in favor of the employee." Id. (citing Long v. Tri-Con Indus., 996 S.W.2d 173, 177 (Tenn.1999)). Accordingly, if an employee presents medical evidence showing that the employment could or might have been the cause of his or her injury when lay testimony reasonably suggests causation, it is appropriate to award benefits. Id.

Relevant workers' compensation statutes direct that

> (1) [a]ny party may introduce direct testimony from a physician through a written medical report on a form established by the

commissioner of labor and workforce development ...[and] (2) [t]he written medical report of a treating or examining physician shall be admissible at any stage of a workers' compensation claim in lieu of a deposition upon oral examination.

Tenn. Code Ann. § 50-6-235(c)(1)-(2) (2005). In consequence, parties may use a medical report, commonly referred to as a C-32 Form, in lieu of depositions as evidence at trial.

Upon our review of this record, we are persuaded that the Panel properly concluded that the evidence preponderates against the trial court's finding that carpal tunnel syndrome arose out of Crew's employment with Anderson Hickey. While she complained of pain and sought treatment for her left extremity, there is no medical evidence showing that Crew was suffering from carpal tunnel syndrome in her left wrist as of January 7, 2002–the time at which the EMG conducted by Dr. Huff was negative for carpal tunnel and less than one month before Crew's lay-off from her employment. Moreover, another EMG conducted one year later showed no carpal tunnel syndrome in Crew's left or right wrists. We have explained that it is "reasonable that the physicians having greater contact with [a] Plaintiff would have the advantage and opportunity to provide a more in-depth opinion, if not a more accurate one" of any resulting impairment or disability. Orman, 803 S.W.2d at 677. Pursuant to our previous reasoning, Dr. Huff–the treating doctor nearest to the time of employment with Anderson Hickey–is in the best position to provide a medical opinion as to the injuries at issue. It was his opinion, as stated, that as of his last treatment, she did not have any type of injury qualifying as a permanent impairment. The results of the EMG first in January of 2002, as to the left upper extremity, and that performed in January of 2003, as to the left and right upper extremities support his conclusion.

It was nine months after the second EMG when Crew first tested positive for carpal tunnel syndrome in her right hand. This followed her eight-month period of employment at Paslode, where she repeatedly stacked cans, an activity identified as a possible cause of carpal tunnel syndrome, according to medical testimony. Dr. West, who began treating Crew more than a year and a half after her employment with Anderson Hickey had ended, provided a C-32 Form which indicated that Crew's right carpal tunnel syndrome were caused by her "employment," without specifically identifying which employer. In his deposition, Dr. West acknowledged that he could not causally relate Crew's impairment of her right upper extremities to her work with Anderson Hickey. In fact, he conceded it was more likely that the progression of her right arm injuries were caused by her subsequent employment at Paslode.

Similarly, any medical evidence from Dr. Janovich linking injury causation with employment came more than two years after Crew was laid off at Anderson Hickey. By checking a box on the form, Dr. Janovich stated that Crew's left upper extremity injuries were caused by her "employment." Neither Anderson Hickey nor Paslode was identified as the employer. Absent any reference to causation through the employment by Anderson Hickey, Dr. Janovich's medical records do not meet the requisite burden of proof.

Although Crew testified, without contradiction, that she had complained of swelling in her left and right wrists prior to the positive results of the EMG administered through Dr. West's office, those symptoms could have been attributed to the lupus diagnosis.   In fact, Dr. Huff attributed Crew's complaints to her arthritic condition.  Further, Crew conceded that her condition in both hands became "worse" while working at Paslode.  That, in addition to her positive left upper extremity EMG study of September 2003–approximately one year and nine months after her employment with Anderson Hickey and towards the end of her eight month employment with Paslode–lends support to Dr. West's assessment.  Although Crew may have had "problems in terms of what she described [while working for Anderson Hickey], it doesn't necessarily mean she had carpal tunnel," he said.   "I think the fact is . . . that the patient developed a positive EMG within nine months of the normal one.  So by assumption, that would mean that the second employer would have been at least the aggravating cause, if not the cause."

The medical records fail to link Crew's carpal tunnel syndrome to any work associated with Anderson Hickey.  There is an insufficient basis to conclude that her carpal tunnel syndrome "arose out of and in the course and scope of her employment" with Anderson Hickey.  In summary, the medical evidence available is that Crew sustained no impairment while working for Anderson Hickey, as shown by Dr. Huff's findings of normal EMG studies conducted in January 2002 and January 2003–during the time of Crew's employment with Anderson Hickey and one year thereafter. Causation must be proven through medical evidence, except when obvious.  See Glisson, 185 S.W.3d at 354; Fitzgerald, 205 S.W.3d at 404; Henley, 699 S.W.2d at 155.  It is only after the medical evidence establishes that duties from a specific employer may have been the cause that lay testimony becomes considered as to causation.  Glisson, 185 S.W.3d at 354.

Indeed, lay testimony confirmed that Crew suffered from swelling, pain, numbness, and tingling in her hands and wrists while working for Anderson Hickey.  Crew testified on her own behalf, without contradiction, that she had complained of problems to Drs. Robbins and Huff and that almost two years later, when she saw Dr. West, her complaints had not changed.  The lay testimony, however, without the support of medical evidence, is insufficient to establish a causal relationship between the employee's work activities with Anderson Hickey.  See Glisson, 185 S.W.3d at 354; Fitzgerald, 205 S.W.3d at 404; Henley, 699 S.W.2d at 155.

### B.  Last Injurious Injury Rule

Had Crew met her burden of establishing a causal connection of her carpal tunnel syndrome to her work at Anderson Hickey, our analysis could have required a consideration of whether employer Anderson Hickey should be held liable in light of the "last injurious injury" rule.  The last injurious injury rule  requires an employer to "take an employee as he finds him."  Baxter v. Smith, 364 S.W.2d 936, 942 (Tenn. 1962).  The rule provides that "in determining which of two successive insurers is liable in a workers' compensation case, the insurer at the time of the employee's last injurious exposure is liable for the injury."  Bldg. Materials Corp. v. Britt, 211 S.W.3d 706, 713

(Tenn. 2007).[8] It is neither the last employment nor the last exposure to the hazards of the disease which impose liability on an employer; rather, it is the last such exposure that is injurious to the employee. Morell v. ASARCO, Inc., 611 S.W.2d 830 (Tenn. 1981). Thus, in order for the rule to apply, there must be some showing that the employee's condition worsened due to the working conditions at the second employer, either by advancement or aggravation of the injury. See Mahoney v. NationsBank of Tennessee, N.A., 158 S.W.3d 340, 346 (Tenn. 2005) (emphasis added) overruled on other grounds, Britt, 211 S.W.3d at 713. Conversely, liability will not attach to an injured employee's last successive employer if the employee's symptoms experienced while at the first employer merely persist. Barker v. Home-Crest Corp., 805 S.W.2d 373, 373-74 (Tenn. 1991). An aggravation or exacerbation of the employee's injury must occur at the second employer. Id. at 375.

Although Anderson Hickey presented the last injurious injury rule as a defense, the trial court did not directly address the issue. By finding that Crew "sustained a compensable, gradual injury to both upper extremities arising out of and within the course and scope of her employment," the trial court only implicitly considered the injury as a consequence of her employment at Anderson Hickey.

We are persuaded that witness testimony implicated the last injurious injury rule. Dr. Huff referred to the "new job" causing Crew's carpal tunnel. Dr. West identified a "second employer" as "at least the aggravating cause, if not the cause." Crew testified that her condition "[g]ot worse" while working at Paslode, and Currie stated that Crew's condition got "worse" during her tenure there.

Whether Crew's subsequent work at Paslode constituted the last such exposure to injury, see Morell, 611 S.W.2d at 830, and whether her condition was aggravated by her employment there, see Mahoney, 158 S.W.3d at 346, are significant questions. See Barker, 805 S.W.2d at 373-74. Crew argues that "[h]er injury and problems were well documented long before she began [employment with Paslode]," and that Anderson Hickey's proof of any "new injury" was "sketchy at best." In support of her position, she posits that "Dr. West's strongest statement is that [Crew's] employment at Paslode . . . could 'possibly' have aggravated the condition in her right wrist." Further, she contends that Townsend v. State, 826 S.W.2d 434 (Tenn. 1992) and Smith v. Smith's Transfer Corp., 735 S.W.2d 221 (Tenn. 1987) stand for the proposition that a mere increase in pain is not enough to constitute an injury by accident.

Crew's belief that Anderson Hickey had presented inadequate medical evidence of a "new injury" is contrary to our case law. In Barker, 805 S.W.2d at 373, this Court considered which of two insurance carriers was obligated to pay benefits for a carpal tunnel injury. We held that the cause of an employee's carpal tunnel injuries was constant, and as such, the employee suffered a new injury each day. Id. at 376. Similarly, in Lawson v. Lear Seating Corp., 944 S.W.2d 340, 342 (Tenn.

---

[8] See Joseph H. King, Jr., The Exclusiveness of an Employee's Workers' Compensation Remedy Against His Employer, 55 Tenn. L.Rev. 405, 425-26 (1988) (discussing the implications of the exclusive remedy rule and last injurious exposure rule).

1997), the issue we faced was when the statute of limitations should begin in cases involving gradual injury, such as carpal tunnel syndrome. Under workers' compensation law, gradually occurring injuries, such as carpal tunnel syndrome, are compensable as "accidental" injuries, rather than occupational. Id. at 341. Although in some instances carpal tunnel syndrome results from a traumatic event, in most cases it is a repetitive stress injury where the symptoms appear and worsen over time. Id. We characterized the injury as a "new trauma" to the claimant's hands each day that she worked. Id. at 343.

In our view, the last injurious injury rule precludes any liability assessment against Anderson Hickey. Dr. West confirmed that Crew's employment at Paslode could have aggravated the condition in her right wrist. See Mahoney, 158 S.W.3d at 346 (Tenn. 2005). Dr. West described the "progression" of her injury such that it ultimately "manifested itself enough to be a positive EMG." Crew and Currie noticed that her condition worsened during her employment at Paslode. See id. Thus, both medical and lay testimony supports the premise that Crew's condition advanced, and was aggravated, during her time of employment at Paslode.

Although the Smith and Townsend cases hold that there is no injury by accident where work aggravates a preexisting condition merely by increasing the pain, we find that general principle inapplicable in this instance. Smith, 735 S.W.2d at 221; Townsend, 826 S.W.2d at 434. In Smith, there was no medical evidence presented that the employee's keyboarding duties as a typist "produced any physical change or advanced the incidence" of a congenital condition, other than increased pain. Smith, 735 S.W.2d at 224. This Court determined that the work "aggravated" her condition, even if it was not the sole cause, but found that her "only problem was pain" and not a compensable "accident." Id. at 224-25. In Townsend, medical proof as to a knee injury unrelated employment showed an "independently progressive" condition. Townsend, 826 S.W.2d at 437. Citing Smith, we reiterated that "there is no injury by accident where work aggravates a pre-existing condition merely by increasing the pain." Id. at 436. We concluded that there is a compensable injury only "if the severity of the condition is advanced, or if it results in a disabling condition other than increased pain." Id. at 436.

Crew did not present facts to support any contention that her work at Paslode merely increased the pain. Instead, she testified, without further explanation, that her condition worsened while at Paslode. Her EMG's, which were negative while employed at Anderson Hickey, were positive after her employment at Paslode. Dr. West actually testified that Crew's condition was "aggravated" by her tenure there, the very kind of medical evidence implicating the last injurious rule. Our previous holdings in Barker and Lawson support that determination. Because of her carpal tunnel syndrome, Crew suffered a new accident resulting in injury each day. Anderson Hickey is, therefore, not liable for Crew's injuries under workers' compensation law. See Hudgins v. U. S. Fid. & Guar. Co., 479 S.W.2d 804 (Tenn. 1972) (finding that the first insurance carrier's demonstration that the employee was injuriously exposed to an occupational disease during the second employment resulted in absolving the first employer and its carrier of liability relating to permanent partial disability from the disease even though the second employer was not a party and its liability was not adjudged).

## C.  Last Day Worked Rule

Inextricably linked to the last injurious injury rule is the last day worked rule.  Although the parties did not raise this potential issue, the trial court's finding that Crew sustained a vocational disability "arising out of her on the job injury of October 23, 2001" necessitates a review of the rule's application.  Initially, gradually occurring injuries, such as carpal tunnel syndrome, are compensable as "accidental" injuries, rather than occupational.  <u>Lawson</u>, 944 S.W.2d at 341.  Although in some cases carpal tunnel syndrome results from a traumatic event, in most cases it is a repetitive stress injury where the symptoms appear and worsen over time.  <u>Id.</u>  Because symptoms can be "episodic" as job duties change, it is difficult, at best, to determine when the "accident resulting in the injury" occurs.  <u>Id.</u>

In <u>Britt</u>, 211 S.W.3d at 708, the sole issue was whether in a workers' compensation action the employee's claim for benefits was time-barred by the statute of limitations.  In 1997, Britt reported back pain to his employer, and after some improvement in his condition, subsequently reported that his back pain was becoming worse.  <u>Id.</u>  He sought permanent partial disability benefits for the first time in 2002.  <u>Id.</u>  Although the trial court held that the employee's claim was time-barred by the statute of limitations–since Britt did not file within one year of his original back injury–the Special Workers' Compensation Appeals Panel found that the claim was not time-barred.  <u>Id.</u>  Using the last-day-worked rule, this court affirmed that the statute of limitations set forth in Tennessee Code Annotated section 50-6-203 does not begin to run until the employee is prevented from working due to the employee's injury.  <u>Id.</u>; <u>see</u> Tenn. Code Ann. § 50-6-203(b)(2) (2005); <u>Lawson,</u> 944 S.W.2d at 341; <u>Barker,</u> 805 S.W.2d at 376.

This line of reasoning instructs us that when an injury such as Crew's is gradually occurring, as with her carpal tunnel syndrome, the last day worked rule is used to help establish the date on which the injury occurred.  <u>See Britt</u>, 211 S.W.3d at 711; <u>Lawson</u>, 944 S.W.2d at 341-42; <u>Barker</u>, 805 S.W.2d at 375. Crew's last day of work in which she was experiencing a new injury each day was at Paslode, where she worked until approximately August or September of 2003.

## D.  Permanent Partial Disability Award

Anderson Hickey also argues that the evidence preponderates against the trial court's award of 25% permanent partial disability to each upper extremity.  Because we have determined that an award to Crew was inappropriate based on issues of causation and pursuant to the last injurious injury rule, we need not address this issue.

## E.  Discretionary Costs - C-32 Form

Finally, Anderson Hickey argues that the trial court erred by awarding Crew discretionary costs of $150 for reimbursement of charges she incurred for a doctor's completion of a Tennessee Department of Labor C-32 form.  The contention is that Dr. West's testimony did not relate Crew's injury to her employment with Anderson Hickey.  Rule 54.04(1) of the Tennessee Rules of Civil Procedure provides, in part, that "[c]osts . . . shall be allowed to the prevailing party unless the court otherwise directs."  Adjudging costs is within the reasonable discretion of the trial court.  <u>Lock v.</u>

Nat'l Union Fire Ins. Co., 809 S.W.2d 483, 490 (Tenn. 1991). Furthermore, the trial judge may apportion the costs between the litigants as is deemed equitable. Tenn. Code Ann. § 20-12-119 (1994). Accordingly, the judgment of the trial court will not be disturbed on appeal absent a showing that the trial judge abused his discretion. Perdue v. Green Branch Mining Co., 837 S.W.2d 56 (Tenn. 1992); Lewis v. Bowers, 392 S.W.2d 819, 823 (Tenn.1965).

Crew is no longer the prevailing party. Moreover, the information gleaned from Dr. West's C-32 filing was adverse to Crew's position. Thus the trial court erred by awarding discretionary costs to Crew.

### IV. Conclusion
Crew failed to meet her burden of establishing causation between her employment at Anderson Hickey and her carpal tunnel syndrome. Further, the last injurious injury rule precludes Anderson Hickey from being held liable for Crew's claim. Pursuant to our holding, Crew is not entitled to discretionary costs. We, therefore, affirm the decision of the Appeals Panel and remand to the trial court for entry of an order dismissing the complaint. Costs are assessed to Crew.

_____
GARY R. WADE, JUSTICE