# IN THE SUPREME COURT OF TENNESSEE
## SPECIAL WORKERS' COMPENSATION APPEALS PANEL
## AT NASHVILLE
September 19, 2011 Session

## DANNEIL EDWARD KEITH v. WESTERN EXPRESS, INC. ET AL.

**Appeal from the Chancery Court for Houston County**
**No. CV-43      Robert E. Burch, Chancellor**

---

**No. M2011-00653-WC-R3-WC - Mailed - December 16, 2011**
**Filed - February 16, 2012**

---

The employee, a truck driver, was injured in the course and scope of his employment when his vehicle left the road and turned over. His employer denied his claim for workers' compensation benefits, contending that the accident and resulting injuries were the direct result of the employee's willful violation of the employer's safety rules. The trial court found that the employee had willfully and intentionally disregarded the safety rules and entered judgment for the employer. On appeal,[1] the employee contends that the trial court erred because the evidence did not establish the perverseness of his conduct, a necessary element of the misconduct affirmative defense. We affirm the judgment.

**Tenn. Code Ann. § 50-6-225(e) (2008) Appeal as of Right; Judgment of the Chancery Court Affirmed**

SHARON G. LEE, J., delivered the opinion of the Court, in which DONALD P. HARRIS, SR. J., and E. RILEY ANDERSON, SP. J., joined.

Daniel C. Todd, Nashville, Tennessee, for the appellant, Danneil Edward Keith.

Sarah Reisner and Michael L. Haynie, Nashville, Tennessee, for the appellees, Western Express, Inc., and PMA Insurance Group.

---

[1] Pursuant to Tennessee Supreme Court Rule 51, this workers' compensation appeal has been referred to the Special Workers' Compensation Appeals Panel for a hearing and a report of findings of fact and conclusions of law.

## MEMORANDUM OPINION

### Factual and Procedural Background

Danneil Edward Keith ("Employee") was employed by Western Express, Inc. ("Employer") as an over-the-road truck driver. He testified that on February 12, 2010, he picked up a load of freight in Tennessee with instructions from Employer to deliver the load to a California destination approximately 1,800 miles away by 4:00 p.m. on February 15, 2010. After taking a requisite ten-hour break, Employee departed Lebanon, Tennessee, for his California delivery point at approximately 11:00 a.m. on February 13, 2010. On February 15, at or around 1:00 a.m., Employee was driving on a flat, straight roadway through New Mexico when he lost control of his truck, and it overturned. Employee admitted that he may have fallen asleep at the wheel and that when the wreck occurred, he was only twenty to thirty minutes from a rest area where he had intended to pull over. Employee alleges that as a result of the accident, he sustained injuries to his head, neck, sternum, ribs, right hand, and right knee.

In its defense, Employer argued that (1) Employee's accident and injuries were caused by his willful violation of established safety rules and (2) Employee had failed to disclose to Employer his use of methadone, a narcotic pain medication.

At the time of the accident, Employer's internal safety rules included "hours-of-service rules" adopted from the Federal Motor Carrier Safety Administration and the United States Department of Transportation. These hours-of-service rules specifically required a driver to take a ten-hour break after driving eleven hours or after being on duty for fourteen hours, with the option of either taking the full ten-hour break all at once or taking an initial eight-hour break followed by a separate two-hour break. Driving after eleven hours of driving or after fourteen hours of being on duty was prohibited pending satisfaction of the ten-hour legal break requirement. Employee admitted that Employer had provided him with a copy of these hours-of-service rules, that during orientation he had undergone training by Employer on these rules, that he was aware that his compliance with the rules was mandatory, and that his direct supervisor, Stuart Pate, had spoken with him about complying with such rules, or, in the parlance of the business, "running legal."

Data showing the driving activity of Employer's drivers is generated by a technology known as "the Qualcomm system," which was described by Employer's executive vice-president, Clarence Easterday, as "a G[lobal] P[ositioning] S[ystem] communications device that's on the tractor [that] allows us to have two-way communication with the truck . . . [and] also provides a GPS record [of] everywhere the truck has been." Although Employee attested that at the time he was driving he thought he was in compliance with the hours-of-

service rules, he agreed that a Qualcomm system report admitted at trial correctly showed that when the accident occurred, he had driven in excess of thirty-six hours without taking the required ten-hour break.

Mr. Easterday testified that based upon the GPS data concerning Employee's truck, Employee was not in compliance with the hours-of-service rules at the time the accident occurred and that the longest break taken by Employee from the time he began the trip until the time of his accident was about five hours. While the GPS data does not specifically confirm Mr. Easterday's testimony regarding the exact duration of Employee's break time during the trip, the data does confirm that Employee failed to take the requisite ten-hour break. Although Mr. Easterday agreed that it would have been impossible for Employee to comply with the hours-of-service rules while making his delivery by the alleged deadline of 4:00 p.m. on February 15, he testified that he does not believe Employee was given a definite delivery time and that the customer in California to whom the delivery was being made "does not have a specific appointment time." However, Mr. Easterday conceded that he did not specifically know whether Employee was told by Employer to deliver his load to the California destination by the alleged deadline.

Mr. Easterday also testified that Employer required new drivers to attend an orientation program at which its safety rules were reviewed and that each driver signed a copy of the rules at that time and again each year thereafter while working for Employer. Based on company records regarding enforcement of the hours-of-service rules, Mr. Easterday testified that, during the one-year period beginning six months before Employee's accident, 191 drivers had been counseled for violating hours of service rules, 127 had been given written warnings, thirty-six had been terminated, three had been placed on probation, and one had been suspended.

Two former drivers for Employer testified on behalf of Employee. Jamey Ward worked for Employer in 2008 and 2009, left the company, and returned for a few months in 2010. On direct examination, Mr. Ward testified that while working for Employer, he had violated safety rules "about every day" and that he had "fixed [his] logbooks however they needed to be to get to where [he] needed to go." However, on cross examination, Mr. Ward stated that Employer "wouldn't tell [him] to do anything illegal" and "want[ed] you to follow the rules." Edward Reynolds worked for Employer two or three months in 2008. He testified that, while working for Employer, he had been directed to violate safety rules by a supervisor he was unable to name. He also testified that he had quit his job with Employer after refusing to pick up a load that he could not legally accept, whereupon "[t]hey called me a low-life truck driver and every name you could imagine in the book."

Stewart Pate, manager of Employer's Nashville terminal and Employee's immediate supervisor, testified that safety rules were very important to Employer, that this point was emphasized to the drivers, and that he would not have directed a driver to violate safety rules to make a delivery. He further testified that when a load is dispatched to a driver, the Qualcomm system requires assurance from the driver that he will comply with Employer's safety rules:

> When we give a driver a load, there is what is called a pre-plan commitment. This is a message the driver sends that says, hey, I can run this load legally, deliver it on time, or, no, I can't do this load legally. And it's basically that they have to respond "yes" if we're going to dispatch them on the load.

Evidence was also presented relating to the issue of whether Employee was barred from recovery for having failed to disclose to Employer that he was using methadone during the time of his employment. It is undisputed that methadone had been prescribed to Employee for treatment of vasculitis, a painful foot condition, beginning in 2006 and throughout his tenure with Employer. Mr. Easterday testified that federal regulations specifically prohibited persons who used methadone from driving a truck in interstate commerce and that if Employee had revealed his methadone use, Employer would not have hired him. Employer introduced Employee's job application and medical forms completed by Employee. The job application included the following question: "Are you able to meet the medical requirements of the DOT?" Employee's response to this question was "yes." Medical examination forms completed on March 19, 2007, and March 4, 2009, included an instruction to "[l]ist all medications (including over-the-counter medications) used regularly or recently." Employee did not list any medications on the 2007 form. The 2009 form indicated that Employee had disclosed to the examining physician that he was taking Neurontin and Zanaflex, but there is no indication that he disclosed his use of methadone. Employee maintained that he only took the methadone during his breaks and did not take it while operating his vehicle.

The trial court entered judgment in favor of Employer, ruling that Employer had sustained its burden of proof that Employee had willfully disregarded its safety rules and, therefore, was barred from recovery by Tennessee Code Annotated section 50-6-110(a) (Supp. 2011). Although the trial court found that Employee had knowingly and willfully misrepresented his methadone use, the court determined that Employer had failed to demonstrate a causal nexus between such misrepresentation and the accident. On appeal, Employee argues that the trial court erred by finding that Employer met its burden of proving that Employee willfully and intentionally violated Employer's safety regulations.

We are statutorily required to review the trial court's factual findings "de novo upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. Code Ann. § 50-6-225(e)(2). Following this standard, we are further required "to examine, in depth, a trial court's factual findings and conclusions." Crew v. First Source Furniture Grp., 259 S.W.3d 656, 664 (Tenn. 2008) (quoting Galloway v. Memphis Drum Serv., 822 S.W.2d 584, 586 (Tenn. 1991)). We accord considerable deference to the trial court's findings of fact based upon its assessment of the testimony of witnesses it heard at trial, although not so with respect to depositions and other documentary evidence. Padilla v. Twin City Fire Ins. Co., 324 S.W.3d 507, 511 (Tenn. 2010); Glisson v. Mohon Int'l, Inc./Campbell Ray, 185 S.W.3d 348, 353 (Tenn. 2006). We review conclusions of law de novo with no presumption of correctness. Wilhelm v. Krogers, 235 S.W.3d 122, 126 (Tenn. 2007). Although workers' compensation law must be liberally construed in favor of an injured employee, the employee must prove all elements of his or her case by a preponderance of the evidence. Crew, 259 S.W.3d at 664; Elmore v. Travelers Ins. Co., 824 S.W.2d 541, 543 (Tenn. 1992).

Employer relies on Tennessee Code Annotated section 50-6-110(a), which provides in part that "[n]o compensation shall be allowed for an injury or death due to . . . (1) [t]he employee's willful misconduct . . . [or] (4) [t]he employee's willful failure or refusal to use a safety device."

The trial court found that Employee's injury was caused by his willful misconduct, specifically his "willful[] and intentional[]" failure to follow Employer's rules pertaining to hours of service. The court's analysis was based on Nance v. State Industries, Inc., 33 S.W.3d 222 (Tenn. Workers' Comp. Panel 2000), in which a previous panel reviewed the application of section 50-6-110(a) to an employee who was injured because he had "failed to use a safety appliance and failed to follow the safety procedures that were adopted by" his employer. Id. at 227. The panel listed four elements that must be proved to establish the defense of willful failure or refusal to use a safety appliance:

> 1. [A]t the time of the injury the employer had in effect a policy requiring the employee's use of a particular safety appliance;
> 2. [T]he employer carried out strict, continuous and bona fide enforcement of the policy;
> 3. [T]he employee had actual knowledge of the policy, including a knowledge of the danger involved in its violation, through training provided by the employer; and
> 4. [T]he employee willfully and intentionally failed or refused to follow the established policy requiring use of the safety appliance.

Id. at 226. Justice Drowota, writing for the panel, noted that "failure to comply with an employer's order or safety rule (not involving a safety appliance)" was "related" to an employee's alleged "willful failure or refusal to use a safety appliance." Id. at 225, n. 3. A more recent panel has noted that the reasoning used in Nance is instructive in determining whether the employee willfully failed to comply with the employer's safety regulation. Durant v. Saturn Corp., No. M2003-00566-SC-WC-MCV, 2004 WL 941012, at *7 (Tenn. Workers' Comp. Panel Apr. 30, 2004). We agree that these four elements apply in assessing whether an employee has willfully failed or refused to comply with an employee's safety regulation, with the only alteration being that the phrases "use of a particular safety appliance" and "use of the safety appliance" respectively set forth in elements 1) and 4) are respectively replaced by the phrases "compliance with a particular safety regulation" and "compliance with the safety regulation."

In the present matter, the trial court found that Employer met its burden as to each of these four elements. Employee does not dispute that Employer satisfied the first three elements; the evidence does not preponderate against the conclusion that Employer established the safety regulation regarding hours of service, that the regulation was consistently enforced, and that Employee was fully aware of the regulation. However, Employee argues that Employer "failed to prove the necessary element of perverseness." "Perverseness" has long been recognized as a component of the willful misconduct defense established by section 50-6-110(a)(1). See Rogers v. Kroger Co., 832 S.W.2d 538, 541 (Tenn. 1992). In Nance, the panel noted as follows that the element of "perverseness" is pertinent in determining whether the employee's failure to abide by a rule was willful:

> In evaluating whether the employee's conduct was willful . . ., the court must distinguish between those cases in which the employee's conduct was accidental, negligent, inadvertent, thoughtless, an error of judgment, or even reckless, and those cases in which the conduct was willful. Wheeler v. Glens Falls Ins. Co., 513 S.W.2d 179, 183 (Tenn. 1974). Moreover, the word "willful" as used in "willful failure or refusal to use a safety appliance" must be construed consistently with its use in the more general defense of "willful misconduct." See Rogers[, 832 S.W.2d at 541] (stating that "three elements are needed to constitute willful misconduct for purposes of the statute: (1) an intention to do the act, (2) purposeful violation of orders, and (3) an element of perverseness."); Wright v. Gunther Nash Min. Const. Co., 614 S.W.2d at 798 (stating, "[i]n defining the term 'willful' this Court has limited its scope to the most extreme

situations, and has for all practical purposes limited its application to willful disobedience to known and understood prohibitions"); and <u>Coleman v. Coker</u>, 204 Tenn. 310, 315, 321 S.W.2d 540, 542 (Tenn. 1959) (stating that "in the overwhelming majority of cases in which this defense has been made it has failed because of the absence of willfulness as that term is normally and usually defined and understood.").

Also in considering whether the employee's action was willful, the Court must determine whether there is a plausible explanation for the employee's failure or refusal to use the safety appliance. <u>See</u> [2 Lex K.] Larson, [<u>Workers' Compensation Law</u>,] at § 35.04. For example, if the proof shows that the employee was not using the safety device because it was inadequate or defective, the employee should not be barred from receiving the benefits to which he or she would otherwise be entitled. <u>Id.</u> If there is a plausible explanation for the employee's failure or refusal to use a safety appliance, the employee's conduct cannot be found to have included "an element of perverseness" and consequently cannot be found to have been "willful."

33 S.W.3d at 226-27.

In essence, Employee argues that the element of perverseness was not established because Employer placed him in a double-bind situation by requiring him to comply with the hours-of-service regulation and at the same time, meet a delivery deadline in California that was impossible to meet if the hours-of-service regulation was complied with. In support, Employee references his own testimony that he was specifically given a delivery deadline that Mr. Easterday agreed could not be met by driving legally, that Employee believed that he was in compliance with the hours-of- service rules at the time his accident occurred and that he had intended to stop at the next rest area twenty to thirty minutes away.

In its findings concerning the element of willfulness, the trial court stated:

Lastly, the Court finds that [Employee] willfully and intentionally failed or refused to follow the established policy requiring a period of rest after the required period of service. He knew what he was supposed to do. They've got log books showing you how to do it. And it's not something that is difficult to follow.

[Employee] knew that he was supposed to take the break. He just thought he could get away with it and was pushing apparently to deliver the load or to get to this particular rest area that he almost made it to.

From the court's language that Employee breached the rule because "[h]e just thought he could get away with it," we infer that the court did not agree that Employee was forced into non-compliance with the rule because of the alleged deadline. In further regard to the trial court's assessment of Employee's credibility as a witness, we note the court's findings with respect to Employee's account of his methadone use:

> With regard to misrepresentation, the Court finds that [Employee] knowingly and willfully made a false representation of his methadone use. He knew he was supposed to disclose methadone use. What I'm getting at is . . . "Well, I wasn't using it right then" or "I hadn't used it recently," and so forth . . . give me a break. He knew he was supposed to put it down.

From these statements of the court and from its ultimate ruling in the case, we infer that the trial court simply did not find Employee's testimony regarding a delivery deadline to be credible. See Richards v. Liberty Mut. Ins. Co., 70 S.W.3d 729, 733-34 (Tenn. 2002) (noting that a "trial court's findings with respect to credibility and the weight of the evidence . . . generally may be inferred from the manner in which the trial court resolves conflicts in the testimony and decides the case"). The absence of a credible explanation from Employee regarding his failure to take the requisite ten-hour break, viewed in conjunction with Employer's proof of its strong emphasis on compliance with safety rules, does not permit us to conclude that the evidence in this record preponderates against the trial court's finding that Employee willfully and intentionally violated the hours of service rule. Employee does not dispute that his violation of the rules was the cause of his accident and injuries. We therefore affirm the trial court's decision.

## Conclusion

The judgment of the trial court is affirmed. Costs are taxed to Danneil Edward Keith and his surety, for which execution may issue, if necessary.

_____
SHARON G. LEE, JUSTICE

# IN THE SUPREME COURT OF TENNESSEE

## AT NASHVILLE

## DANNEIL EDWARD KEITH v. WESTERN EXPRESS, INC. ET AL.

**Chancery Court for Houston County**
**No. CV-43**

**No. M2011-00653-SC-WCM-WC - Filed - February 16, 2012**

### ORDER

This case is before the Court upon the motion for review filed on behalf of Danneil Edward Keith pursuant to Tenn. Code Ann. § 50-6-225(e)(5)(A)(ii), the entire record, including the order of referral to the Special Workers' Compensation Appeals Panel, and the Panel's Memorandum Opinion setting forth its findings of fact and conclusions of law.

It appears to the Court that the motion for review is not well-taken and is therefore denied. The Panel's findings of fact and conclusions of law, which are incorporated by reference, are adopted and affirmed. The decision of the Panel is made the judgment of the Court.

Costs are assessed to Danneil Edward Keith and his surety, for which execution may issue, if necessary.

PER CURIAM

SHARON G. LEE, J., not participating.